# EXHIBIT A

COPY

## IN THE CIRCUIT COURT FOR THE 20TH JUDICIAL DISTRICT
## DAVIDSON COUNTY, TENNESSEE

| | |
|---|---|
| JANE DOE, JANET DOE, and JILL DOE, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiffs, | |
| v. | **CLASS ACTION** |
| HCA HEALTHCARE, INC., and URGENT CARE ENTERPRISE, LLC, d/b/a CARENOW, | **JURY TRIAL DEMANDED** |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiffs Jane Doe, Janet Doe, and Jill Doe, on behalf of themselves and all others similarly situated (collectively "Plaintiffs"), upon investigation of counsel and upon personal knowledge as to Plaintiffs' own conduct and upon information and belief as to all other matters, such that each allegation has evidentiary support or is likely to have evidentiary support upon further investigation and discovery, and for their Class Action Complaint against Defendants HCA Healthcare, Inc., and Urgent Care Enterprise, LLC, d/b/a CareNow (collectively referred to as "Defendant" or "CareNow"),[1] state as follows:

### NATURE OF THE ACTION

1. Defendant CareNow offers online appointment making for urgent care centers located across Tennessee via CareNow branded websites and appointment booking technology.

2. Plaintiffs, individually and on behalf of all members of the proposed class (the

---

[1] As discussed below, upon information and belief, HCA Healthcare, Inc., exercises complete control over Urgent Care Enterprise, LLC, d/b/a CareNow such that they may be considered one and the same.

1

"Class Members") bring this action against Defendant for surreptitiously divulging their health information to Google and other third-party marketing and advertising companies (collectively, the "Third Parties") via online tracking technologies (the "Tracking Technologies") when patients booked appointments with their healthcare providers via the appointment-scheduling web functionality provided by CareNow to its patients (collectively, the "Appointment Making Services").

3. When patients, including Plaintiffs and other Class Members, made online appointments with their doctors using the Appointment Making Services, Defendant shared (1) that patients had made an appointment, (2) the time and date they made the appointment, (3) their patient status, (4) the healthcare provider they made the appointment with, and (4) a trove of personally identifying information ("PII"), which allowed the Third Parties, including companies like Google, to specifically identify patients' real world identities and then exploit their health information for advertising purposes.

4. CareNow did all this without patients' knowledge, authorization, or consent.

5. CareNow is an urgent care healthcare provider headquartered in Nashville, Tennessee, and a covered entity under HIPAA, that owns and operates clinics nationwide, including in Tennessee. CareNow controls and maintains the website www.carenow.com and its webpages (the "CareNow Website"), through which it encourages its patients to book appointments and provide communications regarding their personal health information.

6. CareNow is a subsidiary of Health Corporation of America ("HCA"), a for-profit operator of healthcare facilities that owns and operates thousands of hospitals, surgery centers, and related medical facilities throughout the United States. As of 2025, HCA was ranked #61 on the Fortune 500 rankings of the largest United States corporations, with a reported revenue for the

2

year ending December 31, 2025 of $75 billion. HCA is the ultimate corporate parent of CareNow.

7. CareNow is obligated to maintain the confidentiality of patients' Protected Health Information, including information about the provision of medical services, under state and federal law, including the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

8. Despite these obligations, and unbeknownst to patients, Defendant and its vendors, including Experity d/b/a "Clockwise MD," deployed third-party Tracking Technologies, including Google digital marketing and automatic rerouting tools, on the online Appointment Making Services websites that it offered to patients. Via these tools, Defendant purposefully and intentionally disclosed patients' Protected Health Information to Third Parties who exploited the information and used it for its own economic benefit. By using these tools, Defendant took patients' confidential communications and PHI and automatically sent them to Google and other Third Parties—an unambiguous violation of patients' reasonable expectations of privacy, their rights as patients, and their rights under federal and state law. Defendant did all this knowing it constituted a violation of HIPAA and state law, for the purpose of reaping the illicit financial gains from its criminal and tortious disclosures of patients' PHI.

9. CareNow's conduct in deploying surreptitious Tracking Technologies on its appointment making websites violates reasonable expectations of patient privacy. Defendant did not provide patients with any warnings that using its Appointment Making Services would result in Defendant divulging their PHI, PII, and the substance of their communications to Third Parties.

10. There is no dispute that Defendant's conduct is unlawful. In December 2022, the Office of Civil Rights at the United States Department of Health and Human Services ("HHS") issued a bulletin (the "Bulletin") reminding both covered entities and business associates alike of

3

their patient privacy obligations "when using online tracking technologies."[2] HHS further clarified that health information cannot be shared with "tracking technology vendors" unless they have signed a "business associate agreement (BAA)" to ensure that health information is "protected in accordance with HIPAA."[3]

11. Similarly, Google warns entities like Defendant who provide healthcare-related services that Google Analytics should not be deployed on websites "in any way that implicates Google's access to, or collection of, PHI," expressly warning that entities such as Defendant that they "must refrain from exposing to Google any data that may be considered Protected Health Information" and "may only use Google Analytics on pages that are not HIPAA-covered":[4]

> **Can Google Analytics be used in compliance with HIPAA?**
>
> Customers must refrain from using Google Analytics in any way that may create obligations under HIPAA for Google. HIPAA-regulated entities using Google Analytics must refrain from exposing to Google any data that may be considered Protected Health Information (PHI), even if not expressly described as PII in Google's contracts and policies. Google makes no representations that Google Analytics satisfies HIPAA requirements and does not offer Business Associate Agreements in connection with this service.
>
> For HIPAA-regulated entities looking to determine how to configure Google Analytics on their properties, the HHS bulletin provides specific guidance on when data may and may not qualify as PHI. Here are some additional steps you should take to ensure your use of Google Analytics is permissible:
>
> - Customers who are subject to HIPAA must not use Google Analytics in any way that implicates Google's access to, or collection of, PHI, and may only use Google Analytics on pages that are not HIPAA-covered.
>
> - Authenticated pages are likely to be HIPAA-covered and customers should not set Google Analytics tags on those pages.
>
> - Unauthenticated pages that are related to the provision of health care services, including as described in the HHS bulletin, are more likely to be HIPAA-covered, and customers should not set Google Analytics tags on HIPAA-covered pages..
>
> - Please work with your legal team to identify pages on your site that do not relate to the provision of health care services, so that your configuration of Google Analytics does not result in the collection of PHI.

12. Despite Plaintiffs' and Class Members' reasonable expectations that Defendant would not share their PHI with Google and other third parties via the use of marketing tools, Defendant and its vendors routinely divulged patients' information anyway.

---

[2] *See* Office for Civil Rights, Department of Health and Human Services, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (Dec. 1, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.
[3] *Id.*
[4] https://support.google.com/analytics/answer/13297105?hl=en

4

COPY

13.     Defendant did so through a multi-step process.

a.  Defendant required patients to have first-party cookies enabled to access its Appointment Making Services. This includes all pages available before a patient signs in as well as within the "authenticated" portions of the website. Without first party cookies, the site does not load normally and instead diverts to a captcha verification page that repeatedly reloads, preventing access. In other words, first-party cookies are a prerequisite for basic access and navigation across the site as well as for authenticated session management.

b.   Defendant placed, enabled, and aided the placement of Google source code, on its Appointment Making Services.

c.  When a patient visited Defendant's Appointment Making Services, the Google source code deployed on the websites caused Google identifiers to be ghostwritten onto a patient's communications device as "first-party" cookies belonging to Defendant. By using first-party Google cookies, Defendant prevented patients from blocking the deposit of the Google cookies through the use of third-party cookie blockers. In addition, because Defendant required the use of first-party cookies to access the website, Defendant made certain that all patients who used its Appointment Making Services would have the Google cookies placed on their device.

d.  The Tracking Technology that Defendant deployed on its Appointment Making Services both captured patients' communications and commanded patients' computing devices to re-direct and divulge patient and device identifiers and the content of patient communications to Third Parties via their various

5

COPY

marketing services.

e.   Defendant and the Third Parties used this information for marketing purposes.

14.     Defendant did so through a multi-step process.

15.     Defendant did not make any attempt to obtain Plaintiffs' or Class Members' consent before sharing patients' Protected Health Information with Third Parties, nor does Defendant have express written consent from any Plaintiffs or Class Member to share their Protected Health Information with Third Parties.

16.     Information about a person's physical and mental health is among the most confidential and sensitive information in our society, and the mishandling of medical information can have serious consequences including, but certainly not limited to, discrimination in the workplace or denial of insurance coverage.

17.     Neither Plaintiffs nor any Class Member signed a written authorization permitting Defendant to send their Protected Health Information to Google or any other third parties uninvolved in their treatment.

18.     Plaintiffs and Class Members were unaware that their Protected Health Information was being surreptitiously transmitted to Google and other third parties as they communicated their confidential PHI with their healthcare provider via CareNow's Appointment Making Services.

19.     CareNow owed common law, statutory, and regulatory duties to keep Plaintiffs' and Class Members' communications and Protected Health Information safe, secure, and confidential. Furthermore, by obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Protected Health Information, Defendant assumed legal and equitable duties to those individuals to protect and to safeguard that information from unauthorized disclosure.

20.     Defendant's unauthorized disclosures violate Tennessee law. Moreover, through its

6

COPY

unauthorized disclosures, Defendant breached its fiduciary duties, was unjustly enriched, and committed multiple torts and crimes. As courts have found across the country, violating these privacy rights harms patients, as it misappropriates their rights to control how information about them is distributed and exploits the value their health data in the marketplace. *Doe v. Virginia Mason Medical Center*, 2024 WL 3517759 (Wash. Super.) ("If it did not have value, then entire industries that sell and trade this data would not exist.").

21.     Defendant and its vendors intentionally intercepted Plaintiffs' and Class Members' electronic communications through the deployment and configuration of Tracking Technologies on their Appointment Making Services.

22.     Defendant's conduct caused damage to Plaintiffs and Class Members, at minimum, the following ways:

   a.  Sensitive and confidential Health Information that Plaintiffs and Class Members intended to remain private is no longer private;

   b.  Defendant eroded the essential confidential nature of the provider-patient relationship;

   c.  Plaintiffs and Class Members cannot remediate the privacy harms they have suffered without expending many hours and spending hundreds of dollars a year to pay for third-party services to scrub their Sensitive Health Information from data broker rolls;

   d.  Defendant took something of value (*i.e.*, personal and private Health Information and other personal data), from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' or Class Members' knowledge, informed consent, or authorization, and without sharing the benefit derived; and

7

COPY

e.  Defendant's actions diminished the value of Plaintiffs' and Class Members' Health Information and other personal data.

23.     On behalf of themselves and all similarly situated current Tennessee citizens, Plaintiffs seek an order enjoining Defendant from further unauthorized disclosures of personal information; awarding statutory damages, attorney's fees and costs; and granting any other preliminary or equitable relief the Court deems appropriate.

## PARTIES

24.     Plaintiff Jane Doe is a resident of Rutherford County, Tennessee, who has made multiple appointments with CareNow at its CareNow Urgent Care center in Smyrna, Tennessee. Plaintiff Jane Doe used the CareNow Appointment Making Services to make appointments for emergency care that she received from CareNow, including an appointment for stiches and treatment for an injured foot.

25.     Plaintiff Janet Doe is a resident of Davidson County, Tennessee, who has made multiple appointments with CareNow at its urgent care center in Nashville, Tennessee, CareNow Urgent Care—East Nashville. Plaintiff Janet Doe used the CareNow Appointment Making Services to make appointments for emergency care she received from CareNow, including appointments for treatment of a sinus infection, shoulder pain, and rib contusions from a fall.

26.     Plaintiff Jill Doe is a resident of Davidson County, Tennessee who has made appointments with CareNow at its urgent care center in Nashville, Tennessee.  Plaintiff Jill Doe used the CareNow Appointment Making Services to make appointments for treatment of shingles and a follow up visit to discuss the medications that she was prescribed by CareNow physicians.

27.     Defendant HCA Healthcare, Inc. is a Delaware Corporation with its principal place of business at One Park Plaza, Nashville, Tennessee 37203. It can be served with process through

8

COPY

its registered agent, CT Corporation System, 300 Montvue Rd., Knoxville, TN 37919. HCA is the sole owner of Defendant Urgent Care Enterprise, LLC, d/b/a CareNow and at all times relevant hereto exercised complete control of Urgent Care Enterprise, LLC, and its assets, including its website(s).

28. Defendant Urgent Care Enterprise, LLC, d/b/a CareNow, is a Delaware single-member, manager-managed, limited liability company, wholly owned by Defendant HCA Healthcare, Inc., also with its principal place of business at One Park Plaza, Nashville, Tennessee 37203. It can be served with process through its registered agent, CT Corporation System, 300 Montvue Rd., Knoxville, TN 37919.

<b>JURISDICTION AND VENUE</b>

29. This Court has jurisdiction over this action under Tenn. Code Ann. § 16-10-101.

30. This Court has personal jurisdiction over Defendant because CareNow operates in Davidson County, Tennessee and the conduct at-issue occurred in this County.

31. Venue is proper in this Court under Tenn. Code Ann. § 20-4-101 because the cause of action arose in this County.

<b>FACTUAL BACKGROUND</b>

**A. Defendant Systematically and Routinely Disclosed Patients' Protected Health Information to Third Parties, including Google.**

32. Plaintiffs and Class Members are patients who have used Defendant's Appointment Making Services.

33. Healthcare providers like Defendant have fiduciary, common law, and statutory duties to protect the confidentiality of patients' PHI and to refrain from making unauthorized disclosures of patients' Sensitive Health Information.

34. Medical patients like Plaintiffs and Class Members have a legal interest in

9

preserving the confidentiality of their communications with healthcare providers and their Sensitive Health Information, including their PHI.

35. Patients also have reasonable expectations of privacy that their Sensitive Health Information will not be disclosed to third parties without their express written consent and authorization.

36. Defendant, in conjunction with vendors such as Experity, provides online Appointment Making Services for urgent care centers across Tennessee, including multiple CareNow urgent care centers in Nashville, Tennessee.

37. Defendant encourages patients to use the digital tools on the Appointment Making Services to seek and receive health care services.

38. Defendant's Appointment Making Services are designed for interactive communication with patients, including searching for physicians, scheduling appointments, and exchanging communications with providers.

39. Source code that Defendant installed and configured on its Appointment Making Services causes these communications to be intercepted and disclosed to Google and other Third Parties.

40. Notwithstanding patients' reasonable expectations of privacy and Defendant's legal duties, Defendant systematically and routinely disclosed patients' Protected Health Information, including the contents of patients' communications with their healthcare providers, via automatic data collection mechanisms they embedded in the Appointment Making Services. Each time that Plaintiffs and Class Members began the appointment making process, the contents of their communications were shared in real-time with Google, New Relic, and other third parties via Tracking Technologies that Defendant and its vendors had deployed on the Appointment Making

10

Services.

41. Defendant did this without Plaintiffs' or other patients' knowledge, authorization, or consent. In doing so, Defendant continuously and systematically violated the medical privacy rights of Plaintiffs and Class Members by causing the unauthorized disclosure of their communications to Third Parties including Google.

42. Defendant intentionally incorporated numerous Tracking Technologies into its Appointment Making Services and never disclosed to Plaintiffs and Class Members that it shared their PHI with Google and other Third Parties, including New Relic. Nor did Defendant inform patients that it was permitting Google, New Relic,[5] and other Third Parties to exploit patients' PHI for marketing purposes. As a result, Plaintiffs and Class Members were unaware that their PHI was being surreptitiously transmitted to Google, and other Third Parties when they visited Defendant's Appointment Making Services.

---

[5] New Relic is a monitoring technology that captures user interactions and performance data from websites and transmits the data to New Relic's analytics platform.

11

COPY

43.    CareNow likewise deployed Tracking Technologies on the myhealthone.com patient portal that it offered patients, including Google Analytics. CareNow likewise also enabled Firebase Analytics within the MyHealthOne mobile application that it offered patients. As with CareNow's Appointment Making Services, when patients accessed the MyHealthOne patient portal, the tracking technologies that CareNow deployed inside the web portal and mobile application shared patients' PHI with Google, including information such as their patient status, their logins, the pages they viewed, advertising IDs, IP addresses, cookies, and other identifiers that allowed Google to specifically identify CareNow's patients.



44.    The Tracking Technologies that Defendant deployed on its Appointment Making Services are—by design—invisible to patients. Once integrated into a website, the Tracking Technology source code is executed in the background, meaning that they operate without ever alerting website users of their presence. Further, because of how these tools are designed, they are able to collect, store, and transmit user data in ways that cannot be blocked by "ad blocker" software or by a user refusing to give their consent to data being collected. By using data collected

12

COPY

by Tracking Technologies, Third Parties are able to connect a website user's data to their real-world identity by linking their data to profiles maintained by the Third Parties. For example, this data allowed Google to connect every patient with their Google user accounts.

45. Once Third Parties connect a user's data to their real-world identity, they process, analyze, and assimilate that data so that it can be sold to online advertisers and funneled back to clients like Defendant in the form of aggregated analytics data.

46. Online advertisers—taking advantage of Google's and other Third Parties' troves of personally identifying data—are able to create marketing campaigns that target their advertisements towards specific users, such as Plaintiffs and Class Members.

47. Upon information and belief, CareNow intercepted and disclosed at least the following PHI to Third Parties including Google and New Relic:

a. Plaintiffs' and Class Members' status as patients;

b. Plaintiffs' and Class Members' use of CareNow's Appointment Making Services;

c. Plaintiffs' and Class Members' appointment scheduling;

d. The names of Plaintiffs' and Class Members' physicians;

e. Information related to Plaintiffs' and Class Members' requests for, receipt of, and communications regarding medical treatment, including their appointment information.

48. Defendant breached its obligations to patients in multiple ways, including (1) failing to obtain patients' consent to disclose their PHI to Third Parties, (2) failing to adequately review its marketing programs and web-based technology to ensure its Appointment Making Services were safe and secure, (3) failing to remove or disengage software code that was known

13

and designed to share Plaintiffs' and Class Members' PHI with Third Parties if placed inside the Appointment Making Services, (4) failing to take steps to block the transmission of Plaintiffs' and Class Members' PHI to Third Parties advertising companies like Google and Facebook, (5) failing to warn Plaintiffs and Class Members that Defendant was routinely bartering their PHI to Google, New Relic, and other Third Parties, and (6) otherwise ignoring Defendant's common law and statutory obligations to protect the confidentiality of Plaintiffs' and Class Members' PHI.

49.     The transmission of Plaintiffs' and Class Members' PHI to Google, New Relic, and other Third Parties was not necessary for CareNow's Appointment Making Services or other services or business activities to function. Indeed, the entire publicly stated purpose of those services was to facilitate the provision of healthcare to Plaintiffs and other patients. Given its legal obligations, Defendant did not and could not have had any permissible purpose for deploying Tracking Technologies inside the Appointment Making Services. Defendant's primary, secret, and improper purpose in doing so was, instead, to disclose patients' Sensitive Health Information to Google and other Third Parties in violation of HIPAA.

**B. The Nature of Defendant's unauthorized disclosure of patients' Protected Health Information.**

50.     Defendant's disclosure of current and prospective patients' personal healthcare information occurred because Defendant intentionally deployed source code on the Appointment Making Services, which caused patients' personally identifiable information (as well as the exact contents of their communications) to be transmitted to third parties.

51.     By design, third parties receive and record the exact contents of these communications before the full response from Defendant has been rendered on the screen of the patient's or user's computer device and while the communication with Defendant remains ongoing.

14

COPY

52.     While the information captured and disclosed without permission may vary depending on the pixel(s) embedded, these "data packets" can be extensive, sending, for example, not just the name of a physician and field of medicine, but also the first name, the last name, email address, phone number and zip code and city of residence entered into the booking form. In addition, that data is linked to a specific internet protocol ("IP") address.

53.     Google Analytics, for example, sends information to Google via scripts running in a person's internet browser so each data packet comes labeled with an IP address that can be used in combination with other data to identify an individual or household.

54.     With substantial work and technical know-how, internet users can sometimes circumvent this browser-based wiretap technology. This is why third parties bent on gathering Protected Health Information, like Facebook, implement workarounds that cannot be evaded by savvy users. Facebook's workaround, for example, is called Conversions API (CAPI) while Google's workaround is called Google Signals.

55.     CAPI and Google Signals are effective workarounds because they do not intercept data communicated from the user's browser. Instead, these server-to-server technologies are designed to create a direct connection between Web hosts' marketing data and a third-party like Meta or Google.

56.     While there is no way to confirm with certainty that a Web host like Defendant has implemented workarounds like CAPI without access to the host server, companies like Facebook instruct companies to use the CAPI in addition to the Meta Pixel and share the same events using both tools because such a redundant event setup allows website owners to share website events with Facebook that the pixel may lose.

57.     It is therefore reasonable to assume that companies like Defendant that utilize

15

COPY

Tracking Technologies such as Google Analytics may also have deployed server-to-server technologies as a workaround to share additional patient data with third parties for marketing and advertising purposes.

58. The third parties to whom a website transmits data through pixels and associated workarounds do not provide any substantive content relating to the user's communications. Instead, these third parties are typically procured to track user data and communications for marketing purposes of the website owner.

59. Thus, without any knowledge, authorization, or action by a user, a website owner like Defendant can use source code to commandeer a user's computing device, causing the device to contemporaneously and invisibly re-direct the users' communications to third parties.

60. For example, when Plaintiffs or a Class Member accessed Defendant's website pages deploying Google Analytics, the Google Analytics software directed their browsers to send a message to Google's servers. The information that Defendant sent to Google included the private information that Plaintiffs and Class Members communicated to Defendant's websites, such as the type of medical appointment the patient made, the date, and the specific healthcare provider the patient was seeing. Such private information allows third-party advertising companies like Google to determine that a specific patient was seeking a specific type of confidential medical treatment.

61. Websites like those maintained by Defendant are hosted by a computer server through which the businesses in charge of the website exchange and communicate with internet users via their web browsers.

62. Every website is hosted by a computer server through which the entity in charge of the website exchanges communications with internet users via a client device, such as a computer, tablet, or smart phone, via the client device's web browser.

16

63. Web browsers are software applications that allow users to exchange electronic communications over the internet.

64. Each exchange of an electronic communication over the internet consists of an HTTP request from a client device and an HTTP response from a server. When a user types a URL into a web browser, for example, the URL is sent as an HTTP request to the server corresponding to the web address, and the server then returns an HTTP response that consists of a web page to render in the client device's web browser.

65. In addition to specifying the URL, HTTP requests can also send data to the host server, including users' cookies. Cookies are text files stored on client devices to record data, often containing sensitive, personally identifiable information.

66. In turn, HTTP responses may consist, among other things, of a web page, another kind of file, text information, or error codes.

67. Source code is not visible on the client device's screen, but it may change the markup of a webpage, thereby changing what is displayed on the client device's screen. Source code may also execute a host of other programmatic instructions, including commanding a web browser to send data transmissions in the form of HTTP requests to the website's server, or, as is the case with Defendant's website, to third parties via pixels.

68. In addition to controlling a website's Markup, Source Code executes a host of other programmatic instructions and can command a website visitor's browser to send data transmissions to third parties via pixels or web bugs,[6] effectively open a spying window through which the webpage can funnel the visitor's data, actions, and communications to third parties, along with patients' personally identifiable information like their Facebook IDs and Google User

---

[6] These pixels or web bugs are tiny image files that are invisible to website users. They are purposefully designed in this manner, or camouflaged, so that users remain unaware of them.

17

COPY

accounts.

69.    For example, Defendant's Appointment Making Services' websites included software code that transmitted HTTP requests *directly* to Google, including patients' Protected Health Information, every time a patient interacted with a page on the website.

70.    A vast amount of data is communicated back and forth between a patient's browser, Experity's servers, and Google's servers anytime that a patient makes a HTTP request to view a specific page on an Experity website where Google Analytics is deployed.  A web page load is not just the product of a couple of communications between a patient's browser and a hospital's website server.  A web page load involves tens or even hundreds of requests between a patient's browser and a hospital's server to load individual pages.  The interception and sharing of communications content with Google happens contemporaneously in real time with the page load while the communications between a patient's browser and the hospital's website server are in transit:

COPY



71.     Google Analytics intercepts communications content such as full-string URLs using hooks/APIs (e.g., listeners) that are surreptitiously deployed inside patients' browsers via cookies.  That technology then shares every communication that patients make with Google.

72.     In essence, Defendant encouraged patients to use a tapped device, and once the Webpage was loaded into a patient's browser, the software-based wiretap was quietly waiting for private communications on the Webpage to trigger the tap, which intercepted those communications intended only for Defendant and transmitted those communications to third parties in real-time, including Google.

**C.  Defendant Set Up the Appointment Making Services to Permit the Surreptitious Capture of Patients' Protected Health Information and the Disclosure to Third Parties like Google and New Relic.**

73.     The Appointment Making Services that Defendant provided to patients included the following:

19

COPY

    a.   the ability to send and receive electronic communications;

    b.   computer storage of electronic health record and communications information; and

    c.   processing services for electronic information.

74.    When a patient went to an Appointment Making Services page, Google source code that Defendant and/or its vendor placed deposited "first-party" cookies named _ga, _gid, _gcl, and _au on the patient's computing device. As "first party" cookies, the _ga, _gid, _gcl, and _au cookies are disguised as belonging to Defendant and its vendors, which permitted them to be placed on the patient's device. In fact, however, these are Third Party cookies.

75.    By disguising the Third Party cookies as belonging to Defendant and/or its vendor Experity, Defendant circumvented attempts to block such tracking.

76.    Further, Defendant required patients to have first-party cookies enabled to access the Appointment Making Services, which further assures that Defendant and Experity could deposit Third Party cookies on patient computing devices while patients are using the Appointment Making Services.

77.    Experity's software permitted Defendant to deploy "custom analytics scripts" within the Appointment Making Services including, for example, Google Analytics, Google Ads, and Google DoubleClick source code (collectively, "Google source code"), through which patient identifiers and communications content were divulged to Google while patients are exchanging communications with their healthcare providers and while the communications content is in electronic storage within the Appointment Making Services.

78.    Experity and Defendant knowingly and secretly deployed Google source code inside the Appointment Making Services.

20

79. The Third Party source code that Defendant and its vendors deployed inside the Appointment Making Services intercepted patients' communications for the purpose of redirecting Plaintiffs' and Class Members' PHI to Third Parties, including at least the following identifiers:

a. Patient IP addresses;

b. Unique, persistent patient cookie identifiers;

c. Device identifiers;

d. Account numbers;

e. URLs;

f. Other unique identifying numbers, characteristics, or codes; and

g. Browser-fingerprints.

80. The Third Party source code that Defendant deployed inside the Appointment Making Services also intercepted patients' communications to redirecting Plaintiffs' and Class Members' PHI to Google, including at least the following communications content:

a. Actions to sign up for appointments;

b. The names of Plaintiffs' and Class Members' physicians;

c. The reasons for Plaintiffs' and Class Members' appointments;

d. The days and times the appointments were made;

e. Plaintiffs' and Class Members' searches for information regarding their medical providers; and

f. Plaintiffs' and Class Members' physical location.

81. The amount of data collected is significant. When patients interacted with the Appointment Making Services, Defendant and their vendors disclosed a full-string, detailed URL to Google, typically containing the name of the website, folder, and sub-folders on the webserver;

21

COPY

the name of the precise file requested; and the exact contents of the patients' communications.

82.  For example, when a patient clicked on a button to make an appointment with a specific physician, Google received confirmation that a patient had booked a specific appointment with a specific healthcare provider at a specific time. Google also received cookies, facility ID codes, reservation codes, IP addresses, and other data that allowed Google to link the patients' appointment information with their Google accounts.  In other words, Google was told the patient's name, the fact that the patient had made an appointment, when the patient had made an appointment, and the name of the patient's healthcare provider.

83.  Third Party Data Brokers and Advertising Companies like Meta and Google combine the various data they collect about individuals via online analytics technologies in a process known as "ID bridging," which is the process of "piecing together different bits of information about" a user "to confidently infer that it is the same individual accessing a publisher's site or sites from various devices or browsers."[7] Users can be identified and tracked by "bridging" (or linking) their MAIDs to other sources, such as email addresses, geolocation, or phone numbers.



---

[7] Kayleigh Barber, *WTF Is The Difference Between Id Bridging And Id Spoofing?*, DIGIDAY (July 8, 2024), https://digiday.com/media/wtf-is-the-difference-between-id-bridging-and-id-spoofing/.

84. ID bridging "has long been the foundation of programmatic advertising,"[8] which is the process by which companies "use [] advertising technology to buy and sell digital ads" by "serv[ing] up relevant ad impressions to audiences through automated steps, in less than a second."[9] It entails a "unique identifier[] assigned to individual devices," including "Google's Advertising ID," personal information like geolocation and e-amil address, and "cross-platform linkage."[10] ID bridging is a money-making machine for advertisers and app developers. On the advertiser side, ID bridging "increase the chances of an ad buying platform finding their inventory to be addressable and, therefore, maximizes their 'ad yields.'"[11] And on the app developer side, "publishers can boost revenue from direct-sold campaigns by offering advertisers access to more defined and valuable audiences."[12]

85. In other words, advertisers will be able to find users that are more directly and likely interested in what is being sold by having access to significantly more information. And app users' information will be more valuable (and therefore, bring in more money to app developers) because it is combined with a plethora of other information from various sources.

86. Data brokers and identity graph providers publicly advertise their ability to conduct such bridging.

87. While those within the ID bridging industry describe it as privacy-protective, it is

---

[8] https://www.adexchanger.com/data-driven-thinking/how-can-id-bridging-the-foundation-of-our-space-suddenly-be-a-bad-thing/.

[9] AMAZON, "Programmatic Advertising," https://advertising.amazon.com/blog/programmatic-advertising#.

[10] Anete Jodzevica, *ID Bridging: The Privacy-First Future of Audience Targeting*, SETUPAD (Nov. 15, 2024), https://setupad.com/blog/id-bridging/. Ironically, the example given in this article is a "hashed email," where the email Defendant collected in this example is not hashed.

[11] Bennett Crumbling, *What Is 'ID Bridging' And How Publishers Use It to Grow Direct and Programmatic Revenue?*, OPTABLE (Aug. 22, 2024), https://www.optable.co/blog/what-is-id-bridging.

[12] *Id.*

23

anything but. As courts have noted, the "ability to amass vast amounts of personal data for the purpose of identifying individuals and aggregating their many identifiers" creates "dossiers which can be used to further invade [users] privacy by allowing third parties to learn intimate details of [users'] lives, and target them for advertising, political, and other purposes, ultimately harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them." *Katz-Lacabe v. Oracle Am., Inc.*, 688 F. Supp. 3d 928, 940 (N.D. Cal. 2023) (cleaned up).

88. In February 2019, Oracle published a paper entitled "Google's Shadow Profile: A Dossier of Consumers Online and Real World Life," part of which provides a detailed description of Google's ability to identify individual's real world identities via analytics technologies:

> [A] consumer's "shadow profile" [is a] massive, largely hidden dataset[] of online and offline activities. This information is collected through an extensive web of … services, which is difficult, if not impossible to avoid. It is largely collected invisibly and without consumer consent. Processed by algorithms and artificial intelligence, this data reveals an intimate picture of a specific consumer's movements, socioeconomics, demographics, "likes", activities and more. It may or may not be associated with a specific user's name, but the specificity of this information defines the individual in such detail that a name is unnecessary.[13]

89. In other words, ID bridging is dangerous because of the sheer expanse of information being compiled by companies like Defendant and the Third Parties without the knowledge or consent of users, all of which is being done for pecuniary gain.

90. In addition to the methods described above, which are explicitly designed to track individuals across different devices and apps, Third Parties collect other identifying information that allows them to determine whether the same individual is visiting multiple websites or using multiple apps where technology is called or installed directly.

---

[13] GOOGLE'S SHADOW PROFILE: A DOSSIER OF CONSUMERS' ONLINE AND REAL WORLD LIFE at 1 (Feb. 2019), https://tinyurl.com/2mtuh7vf.

24

COPY

91. For example, if multiple websites or apps are visited from the same location, the pool of potential individuals who are accessing the website or app is narrowed considerably immediately and can be narrowed to a pinpoint over time.

92. HTTP requests, when intercepted by Third Parties, collect device information that can also identify whether the same user is visiting multiple sites or apps, and can distinguish between the devices being used by a particular person. With every visit, and every subsequent HTTP request, the device information will be identical in each.

93. As a result of the foregoing, Third Parties consistently received throughout the Class Period the precise text of communications that Plaintiffs and Class Members made about specific appointments and treaters, as well as information identifying them—all of which constitute PHI.

94. The contents of patients' communications with their treating physicians such as Defendant plainly relate to (and disclose) the past, present, or future physical or mental health or condition of individual patients who interact with Defendant's Appointment Making Services. 45 C.F.R. § 160.103. Worse, no matter how sensitive the area of the portal site that a patient reviewed, the referral URL was acquired by Third Parties along with other Protected Health Information embedded in patients' interactions with the Appointment Making Services.

95. The nature of the collected data is important. Defendant's unauthorized disclosures resulted in Third Parties' obtaining the appointment history of individual patients, no matter how sensitive their medical condition. Third Parties were then able to correlate that history with other known information regarding the users, including their identity, their prior searches, the time of day, and other user actions. This process resulted in Third Parties acquiring vast repositories of personal data about patients that was then used for marketing purposes—all without patients'

25

knowledge, consent, or authorization, or any further action by patients.

96.     By design, Third Parties received the exact contents of patients' communications while they were in transit but before the full response from the healthcare providers had been rendered on the screen of patients' devices.

**D.  What Happened When Patients Communicated with the Appointment Making Services.**

97.     During the Class Period, when patients used the Appointment Making Services, Defendant, through its vendor, Experity, re-directed the precise content of patients' communications made through Defendant's website and patients' identifiers to Third Parties, including Google at various Google domains.

98.     Defendant further re-directed patients' information to the following Google domain: www.google-analytics.com.

99.     The patient identifiers that were re-directed to google-analytics.com include:

a.  The patient's IP address;

b.  The patient's User-Agent information and other data that, when combined, is sufficient to uniquely identify the device;

c.  Reservation codes generated by the healthcare provider that were linked to the specific patient; and

d.  Third Party cookies disguised as cookies belonging to Experity and/or CareNow, which serve as device identifiers and that the Third Party connects to patients. These cookies include but may not be limited to Google's _ga and _ga_HK3FDYQCRR cookies.

100.    Google will always receive at least the device-identifying NID cookie regardless of whether a person is signed into a Google Account. Regardless of a person's Google Account holder

26

status, the NID cookie is a device identifier that is considered personally identifiable as a matter of law when the data includes PHI protected by federal law.

101. Further, if a Google Account holder has signed in to a Google Account on the device in question and did not formally sign out before sending a separate communication to the Appointment Making Services, then Experity and/or CareNow will re-direct both the device identifier cookie (IDE) and the Google Account identifying cookie (DSID). By re-directing both cookies at the same time, Experity and CareNow enable Google to connect the IDE device-identifying cookie to specific Google Account holder such that, once Google has made the connection, it only needs to see the IDE cookie in order to connect a later re-directed communication with the specific Google Account holder.

**E. Defendant's Actions Permitted Google to Connect Patient's Data Across Domains.**

102. Google publicly states that it connects data that advertisers and publishers (like Experity and Defendant) send to it across the different Google Analytics, Google.com, and Doubleclick.net domains.

103. Defendant and its vendor, Experity, use the same tools and source code throughout the Appointment Making Services. Thus, the types of Google cookies deposited on patient devices and the types of PHI and communications content disclosed (as explained above) occurred every time a patient logged in to or took any action within the Appointment Making Services.

**F. Google's Business Model: Exploiting Consumers' Personal Information for Profit.**

104. By any measure, Google is the world's largest data company. Among other services, Google operates the world's most popular search engine (Google), email provider (Gmail), video website (YouTube), mapping service (Google Maps), Internet analytics service for web developers (Google Analytics), and web-browser (Chrome). It also operates various ad

27

COPY

services that are among the world's most popular in their respective categories, including the advertising services of Google DoubleClick and Google AdWords.

105.    Google Analytics has massive reach. As described by the Wall Street Journal, it is "far and away the web's most dominant analytics platform" and "tracks you whether or not you are logged in."[14]

106.    Google cookies provide personally identifiable data about patients who visit the Appointment Making Services to Google. Experity and CareNow transmit personally identifiable Google cookie data to Google.

107.    Google specifically warns developers and advertisers that Google Analytics is not appropriate for HIPAA-covered entities like Defendant and Experity, publicly stating:[15]

> Customers must refrain from using Google Analytics in any way that may create obligations under HIPAA for Google. HIPAA-regulated entities using Google Analytics must refrain from exposing to Google any data that may be considered Protected Health Information (PHI), even if not expressly described as PII in Google's contracts and policies. Google makes no representations that Google Analytics satisfies HIPAA requirements and does not offer Business Associate Agreements in connection with this service.
>
> For HIPAA-regulated entities looking to determine how to configure Google Analytics on their properties, the HHS bulletin provides specific guidance on when data may and may not qualify as PHI. Here are some additional steps you should take to ensure your use of Google Analytics is permissible:
>
> - Customers who are subject to HIPAA must not use Google Analytics in any way that implicates Google's access to, or collection of, PHI, and may only use Google Analytics on pages that are not HIPAA-covered.
>
>   - Authenticated pages are likely to be HIPAA-covered and customers should not set Google Analytics tags on those pages.
>
>   - Unauthenticated pages that are related to the provision of health

---

[14] *Who Has More of Your Personal Data than Facebook? Try Google*, The Wall Street Journal (April 22, 2018) (available at https://www.wsj.com/articles/who-has-more-of-your-personal-data-than-facebook-try-google-1524398401).

[15]    Google,    *HIPAA    and    Google    Analytics,* https://support.google.com/analytics/answer/13297105?hl=en

care services, including as described in the HHS bulletin, are more likely to be HIPAA-covered, and customers should not set Google Analytics tags on HIPAA-covered pages.

- Please work with your legal team to identify pages on your site that do not relate to the provision of health care services, so that your configuration of Google Analytics does not result in the collection of PHI.

108. Google tracks Internet users with IP addresses, cookies, geolocation, and other unique device identifiers.

109. Google cookies are personally identifiable. For example, Google explains the following about certain cookies that it uses:

a. "[C]ookies called 'SID' and 'HSID' contain digitally signed and encrypted records of a user's Google account ID and most recent sign-in time."[16]

b. "Most people who use Google services have a preferences cookie called 'NID' in their browsers. When you visit a Google service, the browser sends this cookie with your request for a page. The NID cookie contains a unique ID Google uses to remember your preferences and other information[.]"[17]

c. "We use cookies like NID and SID to help customize ads on Google properties, like Google Search. For example, we use such cookies to remember your most recent searches, your previous interactions with an advertiser's ads or search results, and your visits to an advertiser's website. This helps us to show you customized ads on Google."[18]

---

[16] *Privacy & Terms, Types of Cookies Used by Google*, Google, http://web.archive.org/web/20210916060858/https:/policies.google.com/technologies/cookies?hl=en-US (archived from September 16, 2021).
[17] *Privacy & Terms, Types of Cookies Used by Google*, Google, http://web.archive.org/web/20210101020222/https:/policies.google.com/technologies/cookies?hl=en-US (archived from January 1, 2021).
[18] *Id.*

29

d. "We also use one or more cookies for advertising we serve across the web. One of the main advertising cookies on non-Google sites is named 'IDE' and is stored in browsers under the domain doubleclick.net. Another is stored in google.com and is called ANID. We use other cookies with names such as DSID, FLC, AID, TAID, and exchange_uid. Other Google properties, like YouTube, may also use these cookies to show you more relevant ads."[19]

110. Google warns web-developers that Google marketing tools are not appropriate for every type of website or webpage, including health-related webpages and websites.

111. Google also warns developers in its Personalized Advertising policies page that "Health in personalized advertising" is a "Prohibited category" for Google's personalized advertising tools. Specifically, Google's advertising policies page states:[20]

> We take user privacy very seriously, and we also expect advertisers to respect user privacy. These policies define how advertisers are allowed to collect user data and use it for personalized advertising. They apply to advertisers using targeting features, including remarketing, affinity audiences, custom affinity audiences, in-market audiences, similar audiences, demographic and location targeting, and keyword contextual targeting. …
>
> You aren't allowed to do the following:

112. The United States Department of Health and Human Services has made clear that "it is insufficient for a tracking technology vendor to agree to remove PHI from the information it receives or to de-identify the PHI before the vendor saves the information. Any disclosure of PHI

---

[19] *Id.*
[20] *Advertising Policies Help, Personalized Advertising*, Google, http://web.archive.org/web/20191031223446/https://support.google.com/adspolicy/answer/1434 65 ?hl=en (archived from October 31, 2019).

30

to the vendor without individuals' authorizations requires the vendor to have a signed BAA in place and requires that there is an applicable Privacy Rule permission for disclosure."[21]

113. Google refuses to sign business associate agreements ("BAA") with healthcare companies like Defendant.

114. After Google collects data that is transmitted to it by Google Analytics, Google analyzes and processes that data for use in selling advertising.

115. Google also uses the data that it collects via Tracking Technology to provide clients like Defendant with analytics data that those clients use to bolster their marketing and advertising strategies and improve the ROI on their marketing and digital advertising spend. Clients like Defendant and Experity also use the analytics data that they receive back from Google to optimize their websites.

116. Defendant benefited financially from sharing Plaintiffs' and Class Members' PHI via Tracking Technologies by receiving, among other things, better and more cost-effective marketing in exchange for disclosing patients' PHI.

**G. Defendant Shared a Trove of Personally Identifiable Information with Google.**

      **i. IP Addresses are Personally Identifiable**

117. IP Addresses are Personally Identifiable.

118. An IP address is a number that identifies a computer or other device (such as a mobile phone) connected to the Internet.

119. IP addresses are used to identify and route communications on the Internet.

120. IP addresses of individual Internet users are used by websites and tracking

---

[21] Office for Civil Rights, Department of Health and Human Services, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (Dec. 1, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

31

companies to facilitate and track Internet communications and target those users with advertising using IP addresses.

121. Under HIPAA, an IP address is considered PII. *See* 45 C.F.R. § 164.514(b)(2)(i)(O).

122. Whenever a patient logged into or used the Appointment Making Services, Defendant, individually and/or through its vendor Experity, caused the disclosure of the patient's IP addresses to Third Parties, along with each re-directed communication described herein, including patient communications concerning individual providers, conditions, and treatments.

### ii. Internet Cookies are Personally Identifiable.

123. In the early years of the Internet, advertising on websites followed the same model as traditional newspapers. Just as a sporting goods store would choose to advertise in the sports section of a traditional newspaper, advertisers on the early Internet paid for ads to be placed on specific web pages based on the type of content displayed on the web page.

124. Computer programmers eventually developed "cookies"—small text files that web servers can place on a person's device when that person's web browser interacts with the server. Cookies can perform different functions, like saving a user's login or other site settings. Eventually, some cookies were designed to acquire and record an individual Internet user's communications and activities on websites across the Internet.

125. Cookies are designed to and, in fact, most often do operate as means of identification for Internet users.

126. Cookies are protected personal identifiers under HIPAA. 45 C.F.R. § 164.514(b)(2)(i)(H), (J), (M), (N), and (R).

127. In general, cookies are categorized by duration and party.

128. There are two types of cookies classified by duration:

32

a. "Session cookies" are placed on a user's computing device only while the user is navigating the website that placed and accesses the cookie. The user's web browser typically deletes session cookies when the user closes the browser.

b. "Persistent cookies" are designed to survive beyond a single Internet- browsing session. The party creating the persistent cookie determines its lifespan. As a result, a persistent cookie can acquire and record a user's Internet communications for years and over dozens or hundreds of websites. Persistent cookies are sometimes called "tracking cookies."

129. Cookies are also classified by the party that uses the collected data:

a. "First-party cookies" are set on a user's device by the website with which the user is exchanging communications. First-party cookies can be helpful to the user, server, and/or website to assist with security, log in, and functionality.

b. "Third-party cookies" are set on a user's device by website servers other than the website or server with which the user is exchanging communications. For example, the same patient who attempts to use the Appointment Making Service to make an appointment with CareNow will typically also have cookies on their device from third parties, such as Google. Unlike first-party cookies, third-party cookies are not typically helpful to the user. Instead, third-party cookies are typically used for data collection, behavioral profiling, and targeted advertising.

130. Data companies like Google and other Third Parties have developed methods for monetizing and profiting from cookies. These companies use third-party tracking cookies to help them acquire and record user data and communications to sell advertising that is customized to that person. To build individual profiles of Internet users, third-party data companies assign each

33

user a unique identifier or set of unique identifiers.

131. Web browsers generally scope cookies to a particular domain and apply security controls that limit how data from one domain may be accessed in another. Ordinarily, Javascript running on a webpage can only read cookies associated with that webpage's own domain, and cookies set for a third-party's domain are only readable by that Third Party. These limitations are due to an Internet security policy known as the same-origin policy that requires web browsers to prevent scripts on one domain from accessing the cookies of a separate domain. For example, although Defendant can deploy source code that uses Third Party cookies to help Third Parties acquire and record the patient's communications, they are not permitted direct access to Third Party cookie values. The reverse is also true: Third Parties were not provided with direct access to the values associated with first-party cookies set by Defendant.

132. Google and other Third-Parties designed their tools to avoid cross domain restrictions by operating through first-party identifiers and linking those identifiers to profiles maintained by the Third Parties. Companies like Defendant then implemented these tools, granting third-parties access to identifiers and other data generated in Defendant's first-party context.

133. JavaScript source code developed by third-party data companies and placed on a webpage by companies such as Defendant can bypass the same-origin policy to send a first-party cookie value in a tracking pixel to the third-party data company. This technique is known as "cookie synching," and it allows two cooperating websites to learn each other's cookie identification numbers for the same user. Once the cookie synching operation is completed, the two websites can exchange any information they have collected and recorded about a user that is associated with a cookie identification number. The technique can also be used to track an individual who has chosen to use third-party cookie blockers.

34

134.    Cookie syncing is a process that "allow[s] web companies to share (i.e., synchronize) cookies and match the different IDs they assign for the same user while they browse the web."[22] This allows entities to circumvent "the restriction that sites can't read each other's cookies, in order to better facilitate targeting and real-time bidding."[23]

135.    Cookie syncing works as follows:

> Let us assume a user browsing several domains like website1.com and website2.com, in which there are 3rd-parties like tracker.com and advertiser.com, respectively. Consequently, these two 3rdparties have the chance to set their own cookies on the user's browser, in order to re-identify the user in the future. Hence, tracker.com knows the user with the ID user123, and advertiser.com knows the same user with the ID userABC.

> Now let us assume that the user lands on a website (say website3.com), which includes some JavaScript code from tracker.com but not from advertiser.com. Thus, advertiser.com does not (and cannot) know which users visit website3.com. However, as soon as the code of tracker.com is called, a GET request is issued by the browser to tracker.com (step 1), and it responds back with a REDIRECT request (step 2), instructing the user's browser to issue another GET request to its collaborator advertiser.com this time, using a specifically crafted URL (step 3).

> …

*[Remainder of the page intentionally left blank]*

---

[22] Panagiotis Papadopoulos *et al.*, *Cookie Synchronization: Everything You Always Wanted to Know But Were Afraid to Ask*, 1 WWW '19: THE WORLD WIDE WEB CONFERENCE 1432, 1432 (2019),                                                    https://dl.acm.org/doi/10.1145/ 3308558.3313542.
[23] Gunes Acar *et al.*, *The Web Never Forgets: Persistent Tracking Mechanisms in the Wild*, 6B CCS'14: ACM SIGSAC CONFERENCE ON COMPUTER AND COMMUNICATIONS SECURITY 674, 674 (2014).

35

COPY

When advertiser.com receives the above request along with the cookie ID userABC, it finds out that userABC visited website3.com. To make matters worse, advertiser.com also learns that the user whom tracker.com knows as user123, and the user userABC is basically one and the same user. Effectively, CSync enabled advertiser.com to collaborate with tracker.com, in order to: (i) find out which users visit website3.com, and (ii) synchronize (i.e., join) two different identities (cookies) of the same user on the web.[24]



136.    Through this process, Third Party trackers like Google's are not only able to resolve user identities (*e.g.*, learning that who Third Party #1 knew as "userABC" and Third Party #2 knew as "user123" are the same person), they can "track a user to a much larger number of websites,"

---

[24] Papadopoulos, *supra*, at 1433.

36

even though they "do not have any collaboration with" the third party.[25]

137.    On the flip side, "CSync may re-identify web users even after they delete their cookies."[26] "[W]hen a user erases her browser state and restarts browsing, trackers usually place and sync a new set of userIDs, and eventually reconstruct a new browsing history."[27] But if a tracker can "respawn" its cookie or like to another persistent identifier (like an IP address), "then through CSync, all of them can link the user's browsing histories from before and after her state erasure. Consequently: (i) users cannot abolish their assigned userIDs even after carefully erasing their set cookies, and (ii) trackers are enabled to link [a] user's history across state resets."[28]

138.    Thus, "syncing userIDs of a given user increases [] user identifiability while browsing, thus reducing their overall anonymity on the Web."[29]

139.    Cookie syncing is precisely what is happening here. Third Parties' trackers sync their unique user identifiers with other third parties on the websites. The result of this process is not only that a single user is identified as one person by these multiple third parties, but they share all the information about that user with one another (because the cookie is linked to a specific user profile). This prevents users from being anonymous when they visit websites.

140.    Whenever a patient uses the Appointment Making Services, Experity and CareNow intercept, use, and cause the disclosure of patient cookie identifiers with each re-directed communication described herein, including patient communications about providers, conditions, treatments, appointments, registration, and log-ins to the Appointment Making Services.

141.    Cookie disclosures by Defendant included the deployment of cookie synching

---

[25] *Id.* at 1434.
[26] *Id.*
[27] *See id.*
[28] *Id.*
[29] *Id.* at 1441.

37

techniques through which Defendant deposited Third Parties' identifiers on patient computing devices as first-party cookies.

142.     Defendant then shared those identifiers with additional Third Parties, which use them for matching and linking the patient's browser or device to identifiers and profiles maintained by those additional Third Parties.

### iii.     Browser-Fingerprints are Personally Identifiable.

143.     Browser-fingerprints are information collected about a computing device that can be used to identify the device.

144.     Browser-fingerprints can be used to identify devices when the devices' IP addresses are hidden, and cookies are blocked. The Electronic Frontier Foundation has explained:

> When a site you visit uses browser fingerprinting, it can learn enough information about your browser to uniquely distinguish you from all the other visitors to that site. Browser fingerprinting can be used to track users just as cookies do, but using much more subtle and hard-to-control techniques. In a paper EFF released in 2010, we found that a majority of users' browsers were uniquely identifiable given existing fingerprinting techniques. Those techniques have only gotten more complex and obscure in the intervening years. By using browser fingerprinting to piece together information about your browser and your actions online, trackers can covertly identify users over time, track them across websites, and building an advertising profile of them.[30]

145.     In 2017, researchers showed that browser fingerprinting techniques can successfully identify 99.24 percent of Internet users.[31]

146.     Browser-fingerprints are protected personal identifiers under HIPAA. 45 C.F.R. § 164.514(b)(2)(i)(M), (R).

---

[30] Katarzyna Szymielewicz and Bill Dudington, *The GDPR and Browser Fingerprinting: How It Changes the Game for the Sneakiest Web Trackers*, Electronic Frontier Foundation (June 19, 2018), https://www.eff.org/deeplinks/2018/06/gdpr-and-browser-fingerprinting-how-it-changes-game-sneakiest-web-trackers.

[31] Yinzhi Cao, Song Li and Erik Wijmans, *(Cross-)Browser Fingerprinting via OS and Hardware Level Features*, Proceedings of the Network and Distributed Security Symposium (March 2017), https://yinzhicao.org/TrackingFree/crossbrowsertracking_NDSS17.pdf.

147.     Whenever patients used the Appointment Making Services, Defendant intercepted, exploited, and caused disclosures of data sufficient to form browser fingerprints for each re-directed communication described herein, including patient communications concerning individual providers, conditions, and treatments.

148.     Each of the individual data elements described above is personally identifiable on its own. However, disclosures of such personally identifiable data elements by Defendant do not occur in a vacuum. The disclosures of the different data elements are tied together and, when taken together, are even more accurate in identifying individual patients, particularly when disclosed to data companies such as Google and other Third Party internet marketing companies that expressly state that they use such data elements to identify individuals and have developed sophisticated algorithms and infrastructure for doing so.

149.     Defendant knowingly disclosed information that allowed Google and other Third-Party advertisers to link Plaintiffs' and Class Members' PHI to their private identities and target them with advertising. Defendant intentionally shared the PHI of Plaintiffs and Class Members with Google to gain access to the benefits of Google Analytics and other Third-Party Tracking Technologies.

150.     The information Plaintiffs and Class Members provided to Defendant via the Appointment Making Services (which is then shared illegally with Google and other Third Parties) can be combined with other information in the Third Parties' possession, like Plaintiffs' and Class Members' names, email addresses, dates of birth, and phone numbers, to more effectively target Plaintiffs and Class Members with advertisements or resell their data.

151.     Defendant knew that by embedding Google Analytics and other Tracking Technologies in the Appointment Making Services, they were permitting Google and other Third

39

Parties to collect, use, and share Plaintiffs' and Class Members' PHI, including sensitive medical information and personally identifiable data.

152.    Defendant was also aware that such information would be shared with Google simultaneously with patients' interactions with the Appointment Making Services.  Defendant chose to barter Plaintiffs' and Class Members' PHI to Google and other Third Parties because they wanted access to Google Analytics and other Third-Party analytics tools. While that bargain financially benefited Defendant, it also betrayed the rights of Plaintiffs and Class Members.

**H.  Defendant Improperly Disclosed Plaintiffs' and Class Members' Protected Health Information to Third Parties Throughout the Class Period.**

153.    The design and operation of the Appointment Making Services as described in this Complaint, was ongoing, consistent, and systematic throughout the Class Period.

154.    The Appointment Making Services operated as described above with respect to the named Plaintiffs in this matter.

155.    For example, when Plaintiff Jane Doe made urgent care appointments with CareNow at its 570 W Sam Ridley Parkway location in Smyrna, Tennessee, she was taken to a website: https://www.clockwisemd.com/hospitals/13311/visits/new?rwg_token=AFd1xnF961BcrqpSJLtu hziNGuhsvIQcgOHcwocDVYr3Lis7OD7A3LVL0-k6GbU0j9FuGg304B003OK0iwYUxutc3nEp0VMCcQ%3D%3D,   which   was   built   using Experity's Clockwise MD appointment making functionality. Plaintiffs were then asked to fill out a detailed form, which included questions such as (1) the reason for their visit, (2) their name, (3) their cell phone number, (4) their email address, and (5) their gender.

EFILED  06/11/26 02:11 PM  CASE NO. 26C1744  Joseph P. Day, Clerk

### i.     Plaintiff Jane Doe

156.    Plaintiff Jane Doe is a patient of CareNow, who has made multiple appointments with CareNow at its CareNow Urgent Care center in Smyrna, Tennessee.  Plaintiff Jane Doe used the CareNow Appointment Making Services to make appointments for emergency care that she received from CareNow, including an appointment for stiches and treatment for an injured foot.

157.    Plaintiff Jane Doe began the appointment making process by visiting CareNow's website located https://www.carenow.com/en-US.

41

COPY

42



158.    The CareNow website allowed her to search for information about medical treatment by using search boxes and drop down menus, such as a search box that allowed patients to enter terms about the kinds of medical treatment they required:

COPY

159.     The CareNow website also allowed Plaintiff Jane Doe to search for an individual CareNow location near her home in Smyrna, Tennessee by typing information into a "Search by Facility Name" feature:



160.     Similarly, the location menu Plaintiff Jane Doe was offered also allowed her to use a drop down menu to search for a location by the medical "Specialties" that each urgent care center offered,  such as "STD testing," "Covid-19 testing," "Infections," Drug Screening," "Urinary Tract Infection," and "Workplace Injuries."

43

COPY



161.    Once at the webpage for the specific CareNow clinic that she selected, Plaintiff Jane Doe was given the option to click on a "Web Check-In" button to make an online appointment.



162.    When Plaintiff Jane Doe clicked the "Web Check-In" button, she was taken to a CareNow Appointment Making Page for her selected location (in this case CareNow-Smyrna), where she was asked to fill out a detailed a detailed online form when she made urgent care appointments using the Appointment Making Services.

44

163. Without Plaintiff's knowledge or consent, every time that she made an urgent care appointment via the Appointment Making Services, the Tracking Technologies Experity and CareNow deployed, including Google Analytics and Google Double Click tracking technologies, shared her PHI with Google, including (1) her patient status, (2) the fact that she had made a medical appointment, (3) the name of her healthcare provider, (4) the time and date she made her appointment, and (5) the unique facility that CareNow assigned to the specific urgent care clinic where Plaintiff Jane Doe was being treated.

164. Along with this PHI, Experity and CareNow also shared data that allowed Google to specifically identify Plaintiff Jane Doe, including her Google User ID, IP address, Google cookies, her geolocation data, her browser fingerprint, and her user agent data.

165. Likewise, because CareNow deployed Google Analytics on every page of its website, CareNow also shared every button Plaintiff Jane Doe clicked, the drop down menu items she selected, the search terms she entered such as "stiches," and every page that she reviewed on

45

EFILED 06/11/26 02:11 PM CASE NO. 26C1744 Joseph P. Day, Clerk

the website when searching for information about her medical treatment.

166. As a result of Experity's and CareNow's deployment of Google Analytics inside the Appointment Making Services, Google was able to link Plaintiff Jane Doe's PHI with her real-world identity and then exploit her PHI for commercial marketing and advertising purposes.

167. After visiting CareNow's website and using its Appointment Making Services, Plaintiff Jane Doe began receiving advertisements on her computer for additional CareNow services.

### ii. Plaintiff Janet Doe

168. Plaintiff Janet Doe is a patient of CareNow, who has made multiple appointments with CareNow at its urgent care center in Nashville, Tennessee, CareNow Urgent Care—East Nashville. Plaintiff Janet Doe used the CareNow Appointment Making Services and CareNow websites to make appointments for emergency care she received from CareNow, including appointments for treatment of a sinus infection, shoulder pain, and rib contusions from a fall.

169. When she made the appointments, Plaintiff Janet Doe was asked to fill out a detailed online form when she made urgent care appointments using the Appointment Making Services available via CareNow's website.

170. Without the knowledge or consent of Plaintiff Janet Doe, every time that she made an urgent care appointment via the Appointment Making Services, the Tracking Technologies that Experity and CareNow deployed, including Google Analytics and Google Double Click tracking technologies, shared her PHI with Google, including (1) her patient status, (2) the fact that she had made a medical appointment, (3) the name of her healthcare provider, (4) the time and date she made her appointment, and (5) the unique facility that CareNow assigned to the specific urgent care clinic where Plaintiff Janet Doe was being treated.

COPY

171.    Along with this PHI, CareNow, through its vendor Experity, also shared data that allowed Google to specifically identify Plaintiff Janet Doe, including her Google User ID, IP address, Google cookies, her geolocation data, her browser fingerprint, and her user agent data.

172.    Plaintiff Janet Doe also used CareNow's MyHealthOne patient portal.

173.    As a result of Experity's and CareNow's deployment of Google Analytics inside the Appointment Making Services, Google was able to link Plaintiff Janet Doe's PHI with her real-world identity and then exploit her PHI for commercial marketing and advertising purposes.

### iii.    Plaintiff Jill Doe

174.    Plaintiff Jill Doe is a resident of Davidson County, Tennessee who has made appointments with CareNow at its urgent care center in Nashville, Tennessee.  Plaintiff Jill Doe used the CareNow Appointment Making Services to make appointments for treatment of shingles and a follow up visit to discuss the medications that she was prescribed by CareNow physicians.

175.    Like Plaintiff Jane Doe, Plaintiff Jill Doe visited the CareNow website to research potential treatment options with CareNow.  This included searches that Jill Doe conducted on the CareNow website for information about the services that CareNow offered in connection with her medical treatment.



176.    Because CareNow had deployed Google Analytics on its website, unbeknownst, to Plaintiff Jill Doe,  the search terms that she entered such as "shingles" were shared with Google,

47

COPY

along with the buttons she clicked and the pages that she viewed.

177. Likewise, when Plaintiff Jill Doe made urgent care appointments using the CareNow Appointment Making Services she was asked to fill out a detailed online questionnaire, which requested information such as her patient status, her symptoms, her name, her telephone number, and her email address.

178. Without Plaintiff Jill Doe's knowledge or consent, every time that she made an appointment via the Appointment Making Services, the Google Analytics and Google Double Click Tracking Technologies that CareNow and Experity had deployed on the Appointment Making Services website shared her PHI with Google, including (1) her patient status, (2) the fact that she had made a medical appointment, (3) the name of her healthcare provider, (4) the time and date she made her appointment, (5) the unique reservation code that CareNow assigned to her appointment, and (6) the unique facility ID that CareNow assigned to the specific urgent care clinic where Plaintiff Jill Doe was being treated.

179. Along with this PHI, CareNow also shared data that allowed Google to specifically identify Plaintiff Jill Doe, including her Google User ID, IP address, Google cookies that linked with her PHI with her Google user account, her geolocation data, his browser fingerprint, and her user agent data.

180. Plaintiffs' experiences are representative of what happened to all Class Members who made urgent care appointments with CareNow via Experity Appointment Making Services during the Class Period.

181. Every time that Plaintiffs and Class Members accessed the Appointment Making Services, the Tracking Technology employed by Defendant intercepted and shared their appointment data with Third Parties, along with other PHI such as their patient status, the name of

48

their healthcare providers, the fact that they had made a medical appointment, the time and date they made the appointment, and the reason for their appointments, along with PII such as their IP addresses, browser fingerprints, and Third Party cookies. Such Protected Health Information, including Plaintiffs' patient status, their medical conditions, and when and where they sought treatment are specifically protected by HIPAA against unauthorized disclosure to third parties. E.g., *Hartley v. Univ. of Chicago Med.* Ctr., No. 22 CV 5891, 2025 WL 2802317, at *4 (N.D. Ill. Oct. 1, 2025).

182. While Defendant could have sought consent from Plaintiffs and Class Members to intercept, collect, and share their PHI with Third Parties, Defendant chose not to because of the likelihood that the majority of patients would refuse. Instead, Defendant surreptitiously deployed hidden Tracking Technologies in an effort to circumvent patients' refusing the exploitation of their Protected Health Information for advertising and marketing purposes.

183. Defendant intentionally deployed Tracking Technologies inside its Appointment Making Services (and thereby shared Plaintiffs' PHI with Google) in return for access to free marketing tools and aggregated data about how individuals interacted with its Appointment Making Services. Defendant took the aggregated patient data they received back from the Third Parties and used that data to optimize its marketing and product designs, thereby increasing Defendant's profitability at the expense of Plaintiffs and Class Members. Defendant further procured its clients' use of tracking technologies for marketing and advertising purposes via Google Tag Manger source code.

184. Each Class Member had his or her interactions with the Appointment Making Services intercepted and shared with Third Parties in a manner substantially similar to what occurred with the named Plaintiffs as detailed above, such that named Plaintiffs' claims are typical

49

of those of the proposed Class as a whole.

**I. Third Parties like Google Share the Data and Information Collected from Tracking Technologies with Data Brokers Who Further Exploit This Information.**

185. In addition to using the data for their own purposes, the Third Parties that obtained patients' PHI from Tracking Technologies installed on the Appointment Making Services further profited from Defendant's improper practices by selling patients' PHI to other data brokers.

186. As one study found, "on average, companies that allow external sharing of [] data assets have data that has been exposed to 42 4th-party domains."[32]

187. Consequently, a fourth party that did not have a tracker directly installed on the website may obtain and use information collected via Third Party trackers to provide direct advertisements to patients on the fourth party's platform.

188. For example, Facebook and Google have engaged in practices that allowed for the sharing or accessibility of user data between their platforms.[33] Because of this, advertisements on Facebook may reflect information collected via a Google tracker, either because of information shared directly or indirectly between the companies.

189. Facebook and Google both act as data brokers, meaning they collect data, compile

---

[32] Adam Gavish, *your 3rd Party Collaborators Share Your Company's Data with 4th Parties*, DoControl (Feb. 27, 2025), https://www.docontrol.io/blog/your-3rd-party-collaborators-share-your-company-data-with-4th-parties#:~:text=What%20is%204th%2DParty%20Data,side%20effect%20of%20SaaS%20collaboration.

[33] *See* Steven Musil, *Facebook gave tech giants more access to users data than it said*, CBSNews (Dec. 19, 2018), https://www.cbsnews.com/news/facebook-gave-tech-giants-more-access-to-users-data-than-it-said-new-york-times/; Steven Musil, *Facebook acknowledges it shared user data with dozens of companies* (Jul. 1, 2018), https://www.cnet.com/tech/tech-industry/facebook-acknowledges-it-shared-user-data-with-dozens-of-companies/; Paresh Dave and Katie Paul, *Google secretly gave Facebook perks, data in ad deal* (Dec. 17, 2020), https://www.reuters.com/article/technology/google-secretly-gave-facebook-perks-data-in-ad-deal-us-states-allege-idUSKBN28Q37G/.

50

COPY

it into datasets, and sell it to fourth parties.[34] Two other popular data brokers are Acxiom and Oracle Data Cloud ("Oracle"). Facebook and Google have been known to buy information from, and sell information to, such data brokers.[35]

190.     Because of this, one company's tracker (*e.g.*, Google Analytics) may collect information, compile it into a dataset (owned by Google), and act as a data broker to sell it to another Third Party (*e.g.,* Facebook), which uses the information to advertise for various parties (like other healthcare institutions) on its own platform.[36] Alternatively, one company's tracker (*e.g.*, Google Analytics) may collect information, compile it into a dataset (owned by Google), and act as a data broker to sell it to a fourth-party advertiser (*e.g.*, another healthcare institution), which uses the information to advertise for on other platforms (*e.g.*, Facebook).[37] Or, one company's tracker (*e.g.*, Google Analytics) may collect information, sell either the raw data or a compiled dataset to another data broker (*e.g.*, Acxiom or Oracle), which data broker sells the information to a fourth party (*e.g.*, Facebook), which uses the information for still other parties' targeted advertising.[38] In any event, the basic idea and results are the same. The Tracking Technologies track and disclose information to fourth parties that use that data and information to advertise a variety of products on a variety of platforms.

---

[34] *See* Jessie G Taft, *Facebook and Google Are the New Data Brokers* (Dec. 18, 2018, updated Jan. 5, 2021), https://dli.tech.cornell.edu/post/facebook-and-google-are-the-new-data-brokers.

[35] *See* Kalev Leetaru, *The Data Brokers So Powerful Even Facebook Bought Their Data* (Apr. 05, 2018), https://www.forbes.com/sites/kalevleetaru/2018/04/05/the-data-brokers-so-powerful-even-facebook-bought-their-data-but-they-got-me-wildly-wrong/.

[36] *See* Don Marti, *et. al.*, *Who Shares Your Information with Facebook?* at 16 (Jan. 2024), https://innovation.consumerreports.org/wp-content/uploads/2024/01/CR_Who-Shares-Your-Information-With-Facebook.pdf (explaining how Facebook uses aggregated data from external data brokers to target users on its platform).

[37] *Id*.

[38] *See* Kalev Leetaru, *The Data Brokers So Powerful Even Facebook Bought Their Data* (Apr. 05, 2018), https://www.forbes.com/sites/kalevleetaru/2018/04/05/the-data-brokers-so-powerful-even-facebook-bought-their-data-but-they-got-me-wildly-wrong/.

51

191. The information that data brokers like Acxiom and Oracle buy and compile from Tracking Technologies (like Facebook's and Google's Tracking Technologies) is inherently sensitive.

192. When advertisers use Google's real-time bidding system (RTB), for example, RTB lets hundreds of companies bid for ad space on individual consumers based on their Google profile, which can include information such as age, sex, and interests. While only one company will win the auction, hundreds of participating companies receive sensitive information about the potential recipient of the ad—device identifiers and cookies, web browsing and location data, IP addresses, and unique demographic information such as age and gender. Worse, many companies participating in the RTB system are not there to fill ad spaces but instead use RTB to collect users' personal data. Likewise, for users using cell phones or other Android devices that run on a Google operating system, every time they open an app on their Android phone or tablet, Google will timestamp it, and every ad the user is shown will be recorded and associated with their device profile.

193. Facebook is no better. Facebook has historically collaborated with data brokers to gather consumer data and enhance its user profiles for targeting advertising. Facebook itself acts as a first-party data broker, collecting data from user activities on its platform to offer targeted advertising, which is its primary revenue source. Facebook's data ecosystem extends through external partnerships, allowing Facebook to collect data from user interactions on other websites and apps. Companies that pay for ads on Facebook can then direct users to their websites, which embed trackers that collect information such as IP addresses and device IDs from visitors.

194. Facebook also has a history of sharing its customers data with third parties, including most infamously Cambridge Analytica, who gained access to the data of tens of millions

52

of Facebook users.  Facebook has also shared its customers data with "partners," such as Acxiom, Oracle, Epsilon, and Experian.  Once this data is shared, neither Facebook nor its users have control over this data as it is endlessly sold and resold to data brokers around the world.

**J.  Plaintiffs' Protected Health Information that Defendant Collected, Disclosed, and Exploited is Plaintiffs' Property, Has Economic Value, and its Illicit Disclosure Caused Plaintiffs Harm.**

195.    The value of data that Third Parties like Google and Facebook extract from people who use the Internet is well understood in the e-commerce industry.

196.    In 2013, the Financial Times reported that the data-broker industry profits from the trade of thousands of details about individuals, and that within that context, "age, gender and location information" were being sold for approximately "$0.50 per 1,000 people."[39]

197.    In a 2021 Washington Post article, the legal scholar Dina Srinivasan said that consumers "should think of Facebook's cost as [their] data and scrutinize the power it has to set its own price."   This price is only increasing.  According to Facebook's own financial statements, the value of the average American's data in advertising sales rose from $19 to $164 per year between 2013 and 2020.

198.    In June 2025, Google began soliciting individuals in the United States to purchase their computer and mobile phone internet browsing history for $540 a year per household participant.

199.    Personal information is now viewed as a form of currency. Professor Paul M. Schwartz noted in the Harvard Law Review:

> Personal information is an important currency in the new millennium. The monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend. Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection

---

[39] https://ig.ft.com/how-much-is-your-personal-data-worth/

of consumer information.[40]

200.    Despite the protections afforded by law, there is an active market for health information. Medical information obtained from health providers garners substantial value because of the fact that it is not generally available to third-party data marketing companies because of the strict restrictions on disclosure of such information under state and federal laws and provider standards, including the Hippocratic oath. Even with these restrictions, however, a multi-billion-dollar market exists for the sale and purchase of such private medical information.[41]

201.    Individuals can sell or monetize their own data if they so choose. For example, Facebook has offered to pay individuals for their voice recordings,[42] and has paid teenagers and adults up to $20 a month plus referral fees to install an app that allows Facebook to collect data on how individuals use their smart phones.[43]

202.    Myriad other companies and apps such as DataCoup, Nielsen Computer, Killi, and UpVoice also offer consumers money in exchange for access to their personal data.[44]

203.    Defendant "sold" Plaintiffs' and Class Members' PHI to Google as that term is defined under HIPAA.

204.    Defendant was compensated for its disclosures of Plaintiffs' and Class Members' PHI in the form of enhanced analytics and marketing services.  Among other things, Defendant

---

[40] Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 HARV. L. REV. 2055, 2056-57 (2004).
[41]    https://revealnews.org/blog/your-medical-data-is-for-sale-and-theres-nothing-you-can-do-about-it/; *see also https://slate.com/technology/2022/06/health-data-brokers-privacy.html*
[42]    https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-prounnciations-app
[43]    https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html
[44]    https://www.creditdonkey.com/best-apps-data-collection.html;    *see    also* https://www.monetha.io/
blog/rewards/earn-money-from-your-data/

54

COPY

used the analytics data to advertise its services to the patients whom Defendant was supposedly serving and protecting from privacy violations.

205. Defendant did not pay (or offer to pay) Plaintiffs and Class Members for their PHI before Defendant shared this data with Google and other Third Parties.

206. Defendant profited from Plaintiffs' and Class Members' information without ever intending to compensate Plaintiffs and Class Members or inform them that the disclosures had been made.

207. Defendant was unjustly enriched by its conduct.

208. As a consequence of Defendant's unauthorized disclosure of patients' PHI to Google and other Third Parties, Plaintiffs and Class Members have further been harmed by their loss of control over their own PHI, which has now been shared with numerous data brokers participating in the online data market.

209. The only remedy for patients whose PHI has been shared with Google and other Third Parties is to use services such as DeleteMe and CyEx Privacy Shield Pro that go out into the online marketplace and "delete" patients' personal data from data broker rolls. These services, however, cost anywhere from $100 to $300 a year on average for consumers to try and regain control over their personal information.

**K. Plaintiffs and Class Members Have a Reasonable Expectation of Privacy in Their Protected Health Information.**

210. As patients using the Appointment Making Services, Plaintiffs and Class Members had a reasonable expectation that Defendant would not disclose their PHI or the content of their communications to Third Parties without their express authorization.

211. Plaintiffs' and Class Members' reasonable expectations of privacy in their PHI and communications exchanged with Defendant are derived from multiple sources, including at least:

55

COPY

- Defendant's status as an Appointment Making Services provider and facilitator of Plaintiffs' and Class Members' healthcare;

- Defendant's status as healthcare providers;

- Defendant's status as covered entities under HIPAA that provide healthcare-related services and, in doing so, create, receive, maintain, and transmit PHI;

- Defendant's common law obligations to maintain the confidentiality of Sensitive Health Information and communications;

- State and federal laws and regulations protecting the confidentiality of PHI;

- State and federal laws protecting the confidentiality of communications and computer data; and

- State laws protecting against unauthorized use of personal means of identification.

212. It was reasonable for Plaintiffs and Class Members to assume that Defendant's practices were consistent with Defendant's duties to protect the confidentiality of patients' Sensitive Health Information.

213. Indeed, multiple studies examining the collection and disclosure of consumers' sensitive medical information confirm that the disclosure of sensitive medical information violates expectations of privacy that have been established as general social norms.

214. Privacy polls and studies also uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

215. For example, a recent study by Consumer Reports showed that 92% of Americans

56

believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believed that internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[45]

216. Users act consistently with these preferences. For example, following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to share data when prompted.[46]

217. "Patients are highly sensitive to disclosure of their health information," particularly because it "often involves intimate and personal facts, with a heavy emotional overlay." Peter A. Winn, *Confidentiality in Cyberspace: The HIPAA Privacy Rules and the Common Law*, 33 RUTGERS L.J. 617, 621 (2002). Unsurprisingly, empirical evidence demonstrates that "[w]hen asked, the overwhelming majority of Americans express concern about the privacy of their medical records." Sharona Hoffman & Andy Podgurski, *E-Health Hazards: Provider Liability and Electronic Health Record Systems*, 24 BERKLEY TECH L.J. 1523, 1557 (2009).

218. The concern about sharing Sensitive Health Information is compounded by the reality that advertisers view this type of information as particularly valuable. Indeed, having access to the data women share with their healthcare providers allows advertisers to obtain data on children before they are even born. As one recent article noted, "What is particularly worrying about this process of datafication of children is that companies like [Facebook] are harnessing and collecting multiple typologies of children's data and have the potential to store a plurality of data

---

[45] https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/

[46] https://www.wired.co.uk/article/apple-ios14-facebook

COPY

traces under unique ID profiles."[47]

219. Many privacy law experts have expressed serious concerns about patients' sensitive medical information being disclosed to Third Party companies like Facebook and Google. As those critics have pointed out, having a patient's personal Sensitive Health Information disseminated in ways the patient is unaware of could have serious repercussions, including affecting their ability to obtain life insurance, how much they might pay for such coverage, the rates they might be charged on loans, and the likelihood of their being discriminated against.

220. As a result of Defendant's disclosure of Plaintiffs' Sensitive Health Information to Third Parties without authorization via Tracking Technologies, Plaintiffs and Class Members have suffered the following injuries:

    a. Loss of privacy;

    b. Unauthorized disclosure of their Sensitive Health Information;

    c. Unauthorized access of their Sensitive Health Information by Third Parties;

    d. Defendant benefitted from the use of Plaintiffs and Class Members' Sensitive Health Information without sharing that information with Plaintiffs and Class Members;

    e. Repeated targeted advertisements from third and fourth parties on social media and other websites, reflecting Plaintiffs' and Class Members' PHI that was improperly disclosed and used;

    f. Lost benefit of their bargain with Defendant, as Plaintiffs and Class Members did not receive the reasonable privacy and data security protections for which they paid;

    g. Defendant enriched itself at Plaintiffs' and Class Members' expense without sharing the revenue and profit attributable to collecting their Sensitive Health Information without authorization and sharing it with Third Parties (and fourth parties);

    h. Defendant profited off of disclosing Plaintiffs' and Class Members' Sensitive Health Information without authorization and sharing it with Third Parties (and fourth parties) through savings in marketing costs;

---

[47] https://thereader.mitpress.mit.edu/tech-companies-are-profiling-us-from-before-birth/.

58

i.  Defendant profited as a result of collecting Plaintiffs' and Class Members' Sensitive Health Information without authorization and sharing it with Third Parties (and fourth parties) through its revenues and profits attributable to serving and monetizing advertisements directed to Plaintiffs and Class Members;

j.  Plaintiffs and Class Members lost their ability to keep their Sensitive Health Information private;

k.  Plaintiffs and Class Members cannot remediate the privacy harms they have suffered without many hours of work and spending hundreds of dollars a year to pay for third-party services to scrub their Sensitive Health Information from data broker rolls;

l.  Embarrassment, humiliation, frustration, and emotional distress;

m.  Decreased value of their Sensitive Health Information;

n.  Increased risk of future harm resulting from future use and disclosure of their Sensitive Health Information; and

o.  Statutory damages.

**L.  Plaintiffs' and Class Members' Protected Health Information is Protected Against Unauthorized Disclosure by Both State and Federal Law.**

221.  The confidentiality of Plaintiffs' and Class Members' PHI is specifically protected by law.  *E.g.*, 45 C.F.R. § 164.514.  The prohibitions against disclosing PHI include prohibitions against disclosing personally identifiable information such as patient names, IP addresses, and other unique characteristics or codes.  *E.g.*, 45 C.F.R. § 164.51.  Both state and federal law also restrict the use of Plaintiffs' and Class Members' PHI, including their status as patients, to only those uses related to their care unless patients have provided express written authorization to the contrary.

222.  Defendant had no legal right to share Plaintiffs' and Class Members' PHI with third parties without their written consent because this information is protected from such disclosure by law. 45 C.F.R. § 164.508.

223.  Defendant was not permitted to disclose Plaintiffs' and Class Members' PHI to Third Party advertising and marketing companies like Google without express written

59

COPY

authorization from patients. *E.g.*, 45 C.F.R. § 164.502(a)(5)(ii).

224.    Indeed, as discussed above, HHS recently confirmed that hospitals are prohibited from transmitting Health Information via Tracking Technologies like Google Analytics or the Meta Pixel without a patient's authorization and other protections like a business associate agreement with the recipient of the PHI.

225.    Among other things, HHS warned healthcare providers like Defendant that "[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of Health Information to tracking technology vendors or any other violations of the HIPAA Rules. For example, disclosures of Health Information to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures."[48]

226.    Defendant failed to obtain a valid written authorization from Plaintiffs or Class Members to allow the capture and exploitation of their Protected Health Information and the contents of their communications for marketing purposes.

227.    Plaintiffs' and Class Members' PHI is protected by federal law under HIPAA and its implementing regulations, which are promulgated by HHS.

228.    The HIPAA Privacy Rule, located at 45 CFR Part 160 and Subparts A and E of Part 164, "establishes national standards to protect individuals' medical records and other individually identifiable health information (collectively defined as 'protected health information') and applies to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically."[49]

---

[48] https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

[49] Department of Health and Human Services, *Health Information Privacy* (Mar. 31, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/index.html.

60

229.    Business associates like Experity, which function as Business Associates, must also comply with the privacy obligations imposed by HIPAA.[50]

230.    The Privacy Rule broadly defines "protected health information" as "individually identifiable health information" ("IIHI") that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. §160.103; *see* n.1, *supra*.

231.    IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. §160.103.

232.    Under the HIPAA de-identification rule, "health information is not individually identifiable only if": (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination'"; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed:

    A. Names;

    . . .

    H. Medical records numbers;

---

[50] 78 Fed. Reg. 5568 (2013) (extending certain HIPAA Privacy and Security Rules, like those described here, to business associates).

61

COPY

. . .

J. Account numbers;

. . .

M. Device identifiers and serial numbers;

N. Web Universal Resource Locators (URLs);

O. Internet Protocol (IP) address numbers; … and

R. Any other unique identifying number, characteristics, or code…; and the covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

45 C.F.R. § 164.514.

233. The HIPAA Privacy rule requires covered entities and business associates to maintain appropriate safeguards to protect the privacy of PHI and sets limits and conditions on the uses and disclosures that may be made of PHI without authorization. 45 C.F.R. §§ 160.103, 164.502.

234. An individual or corporation violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d-1320d-9 ("Part C"): "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." The statute states that a "person … shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained by a covered entity … and the individual obtained or disclosed such information without authorization." 42 U.S.C. § 1320d-6.

235. Violation of 42 U.S.C. § 1320d-6 is subject to criminal penalties. 42 U.S.C. § 1320d-6(b). There is a penalty enhancement where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal

62

gain, or malicious harm." In such cases, the entity that knowingly obtains individually identifiable health information relating to an individual shall "be fined not more than $250,000, imprisoned not more than 10 years, or both."

236. Courts have recognized that patient status is protected by HIPAA. *E.g.*, *In re Meta Pixel Healthcare Lit.*, Case No. 3:22-cv-03580-WHO, Dkt. 159 at 12 (N.D. Cal. Dec. 22, 2022) ("I agree that the information at issue here appears to show patient status and thus constitutes protected health information under HIPAA."); *id.* at 15 ("[T]he Pixel captures information that connects a particular user to a particular health care provider – i.e., patient status – which falls within the ambit of information protected under HIPAA.").

237. Guidance from HHS confirms that patient status is protected by HIPAA:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data. … **If such information was listed with health condition, health care provision** or payment data, **such as an indication that the individual was treated at a certain clinic**, then this information would be PHI.[51]

238. In December 2022, HHS issued a Bulletin "to highlight the obligations" of health care providers and their business associates under the HIPAA Privacy Rule "when using online tracking technologies" such as the "Meta Pixel," which "collect and analyze information about how internet users are interacting with a regulated entity's website or mobile application."[52]

---

[51] Office for Civil Rights, Dep't of Health and Human Servs., *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule* at 5 (emphasis added) (Nov. 26, 2012), https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf.

[52] Office of Civil Rights, Dep't of Health and Human Servs., *HHS Office of Civil Rights Issue Bulletin on Requirements under HIPAA for Online Tracking Technologies to Protect the Privacy and Security of Health Information* (Dec. 1, 2022), https://www.hhs.gov/about/news/2022/12/01/hhs-office-for-civil-rights-issues-bulletin-on-requirements-under-hipaa-for-online-tracking-technologies.html.

63

COPY

239. In the Bulletin, which was amended in June 2024, HHS explained that tracking technologies on password-protected patient portals "generally have access to PHI" and may access diagnosis and treatment information, in addition to other sensitive data:

> Regulated entities may have user-authenticated webpages, which require a user to log in before they are able to access the webpage, such as a patient or health plan beneficiary portal or a telehealth platform. **Tracking technologies on a regulated entity's user-authenticated webpages generally have access to PHI.** Such PHI may include, for example, an individual's IP address, medical record number, home or email addresses, dates of appointments, or other identifying information that the individual may provide when interacting with the webpage. **Tracking technologies within user-authenticated webpages may even have access to an individual's diagnosis and treatment information, prescription information, billing information, or other information within the portal**. Therefore, a regulated entity must configure any user-authenticated webpages that include tracking technologies to allow such technologies to **only** use and disclose PHI in compliance with the HIPAA Privacy Rule and must ensure that the electronic protected health information (ePHI) collected through its website is protected and secured in accordance with the HIPAA Security Rule.[53]

240. The HHS Guidance further explained that tracking technology vendors like Google are considered business associates under HIPAA and that entities who use their services must obtain a business associate agreement ("BAA") before utilizing their services:[54]

> [T]racking technology vendors are business associates if they create, receive, maintain, or transmit PHI on behalf of a regulated entity for a covered function (*e.g.* health care operations) or provide certain services to or for a covered entity (or another business associate) that involve the disclosure of PHI. In these circumstances, regulated entities must ensure that the disclosures made to such vendors are permitted by the Privacy Rule and enter into a business associate agreement (BAA) with these tracking technology vendors to ensure that PHI is protected in accordance with the HIPAA Rules. For example, if an individual makes an appointment through the website of a covered health clinic for health services and that website uses third party tracking technologies, then the website

---

[53] Office of Civil Rights, Department of Health and Human Services, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (emphasis added).

[54] On June 20, 2024, in *American Hospital Association, et al. v. Xavier Becerra, et al.,* Case No. 4:23-cv-01110-P (N.D. Tx., Jun. 20, 2024, Doc. 67), the U.S. District Court for the Northern District of Texas vacated HHS's March 14, 2024 Bulletin as to the "Proscribed Combination," *but* acknowledged that the Proscribed Combination could be PHI in certain circumstances.

might automatically transmit information regarding the appointment and the individual's IP address to a tracking technology vendor. In this case, the tracking technology vendor is a business associate and a BAA is required.[55]

241. HHS reiterated that "[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of HIPAA Rules."[56]

242. As HHS explained, an "impermissible disclosure" of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms:

243. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment.[57]

## TOLLING, CONCEALMENT, AND ESTOPPEL

244. The applicable statutes of limitation have been tolled because of Defendant's knowing and active concealment and denial of the facts alleged herein.

245. Defendant seamlessly incorporated Tracking Technologies into the websites offering the Appointment Making Services, providing no indication to Plaintiffs or Class Members that their PHI and PII were being disclosed and that they were being tracked for marketing purposes. Defendant intentionally concealed that, by interacting with the Appointment Making Services, Plaintiffs' and Class Members' PHI and PII would be intercepted, collected, used by,

---

[55] *Id.*
[56] *Id.*
[57] *Id.*

65

and disclosed to Third Parties. Defendant's fraudulent concealment of their efforts to share PHI and PII with Third Parties (including information that specifically identified patients' real-world identities) violated the duties that Defendant owed Plaintiffs and Class Members, tolling the statute of limitations.

246. Plaintiffs and Class Members could not, with due diligence, discover the full scope of Defendant's conduct, because there were no disclosures or other indication that they were interacting with Appointment Making Services that employed Google Analytics and other Tracking Technologies.

247. The earliest Plaintiffs and Class Members could have known about Defendant's conduct was approximately March 2026, when Plaintiffs contacted the undersigned counsel to discuss their potential claims against Defendant.

248. All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. Additionally, Defendant was under a duty to disclose the nature and significance of its data collection practices but did not do so. Defendant is therefore estopped from relying on any statute of limitations defenses.

## CLASS ACTION ALLEGATIONS

249. Plaintiffs re-allege and incorporate by reference the allegations set forth above.

250. Plaintiffs bring this statewide class action on behalf of themselves and on behalf of other similarly situated current Tennessee citizens.

251. The statewide class that Plaintiffs seek to represent is defined as follows:

All Tennessee citizens who, during the applicable statute of limitations, made appointments via the Appointment Making Services offered by CareNow where Google Analytics, or similar third-party analytics code, was deployed.

252. Excluded from the Class are Defendant and any of its members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; and the Court staff assigned to

66

COPY

this case and their immediate family members. Plaintiffs reserve the right to modify or amend the Class definition, as appropriate, during the course of this litigation.

253.    This action has been brought and may properly be maintained on behalf of the Class proposed herein under the criteria of the Tennessee rules of Civil Procedure.

254.    **Numerosity:** Class Members are so numerous that their individual joinder is impracticable. The precise number of Class Members and their identities are unknown to Plaintiffs at this time but will be determined through discovery through the records of Defendant.

255.    **Commonality:** Common questions of law and fact exist and predominate over questions affecting only individual Class Members. These common legal and factual questions include the following:

a.  Whether Defendant's practices relating to disclosures of Plaintiffs' and Class Members' Sensitive Health Information to third parties were intentional;

b.  Whether Defendant profited from disclosures to the third parties;

c.  Whether Defendant intentionally violated HIPAA by deploying tracking technologies on its websites despite its knowledge that such technologies illegally disclosed PHI to Third Parties;

d.  Whether Defendant's practices constitute an unauthorized intrusion upon seclusion;

e.  Whether Defendant's practices constitute identity theft;

f.  Whether Defendant's practices constitute a breach of fiduciary duty;

g.  Whether Defendant's practices constitute tampering with computer data;

h.  Whether Defendant's practices constitute unjust enrichment;

i.  Whether placement of the Google cookies disguised as belonging to Defendant on Plaintiffs' and Class Members' computing devices is a highly offensive intrusion

67

upon seclusion;

j. Whether Defendant's conduct harmed and continues to harm Plaintiffs and Class Members, and if so, the extent of the injury;

k. Whether and to what extent Plaintiffs and Class Members are entitled to damages and other monetary relief;

l. Whether and to what extent Plaintiffs and Class Members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction; and

m. Whether and to what extent Plaintiffs and Class Members are entitled to attorneys' fees and costs.

256. **Typicality:** Plaintiffs' claims are typical of the claims of the Class and Plaintiffs have substantially the same interest in this matter as other Class Members. Plaintiffs have no interests that are antagonistic to, or in conflict with, the interests of the other Class Members. Plaintiffs' claims arise out of the same set of facts and conduct as all other Class Members. Plaintiffs and all Class Members are patients who used the Appointment Making Services and are victims of Defendant's unauthorized disclosures to Third Parties. All Plaintiffs' and Class Members' claims are based on Defendant's wrongful conduct and unauthorized disclosures.

257. **Policies Generally Applicable to the Class:** This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly, and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

68

258. **Adequacy of Representation:** Plaintiffs will fairly and adequately protect the interests of Class Members. Plaintiffs have retained competent counsel experienced in complex class action privacy litigation and Plaintiffs will prosecute this action vigorously. Plaintiffs have no interests adverse or antagonistic to those of the Class.

259. **Declaratory and Injunctive Relief:** Defendant acted or refused to act on grounds generally applicable to Plaintiffs and the other Class Members, thereby making appropriate final injunctive relief and/or declaratory relief, as described below.

260. **Superiority:** A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members are small compared with the burden and expense that would be entailed by individual litigation of their claims against Defendant. It would thus be virtually impossible for the Class Members, on an individual basis, to obtain effective redress for the wrongs done them. Furthermore, even if Class Members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

261. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action. Adequate notice can be given to Class Members directly using

69

COPY

information maintained in Defendant's records.

262.	Additionally, the Class may be certified because:

a.	The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for Defendant;

b.	The prosecution of separate actions by individual Class Members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class Members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

c.	Defendant have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class Members as a whole.

## COUNT I
### Negligence
*(On Behalf of Plaintiffs and the Class)*

263.	Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

264.	Plaintiffs bring this claim on behalf of themselves and all members of the Class.

265.	Upon accepting, storing, and controlling the PHI of Plaintiffs and Class Members, Defendant owed a duty to Plaintiffs and Class Members to exercise reasonable care to secure, safeguard, and protect their highly sensitive PHI.

266.	Defendant breached this duty by failing to exercise reasonable care in safeguarding and protecting Plaintiffs and Class Members' PHI from unauthorized disclosure.

70

267.    It was foreseeable to CareNow that deploying Google Analytics on its Patient Portals and Mobile Application would result in the patients' PHI being shared with Google. By deploying Google Analytics inside its Appointment Making Services, CareNow acted with wanton and reckless disregard for the security and confidentiality of Plaintiffs and the Class Members' PHI.

268.    CareNow also had a duty to notify Plaintiffs and Class Members within a reasonable a reasonable time frame of any breach to the confidentiality and security of their PHI. This duty is required and necessary for Plaintiffs and Class Members to take appropriate measures to protect the confidentiality of their PHI and to mitigate the harm caused by CareNow's conveyance of their PHI to Google.

269.    CareNow owed these duties to Plaintiffs and the Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom CareNow knew or should have known would suffer injury-in-fact from CareNow's deployment of Google Analytics inside its Appointment Making Services.

270.    The risk that Google would access, exploit, and misuse Plaintiffs' and Class Members' PHI was foreseeable.  Given that CareNow receives vast amounts of PHI, and that Google warns health care systems not to share health data with it via Google Analytics, CareNow was on notice of the need to protect Plaintiffs' and Class Members' PHI from unauthorized disclosures via analytics technologies.

271.    PHI is highly valuable, and CareNow knew or should have known the risks in obtaining, storing, handling, transmitting, and using Plaintiffs' and Class Members' PHI, and the importance of exercising reasonable care in the handling and protection of Plaintiffs' and Class Members' PHI.

COPY

272.     CareNow breached its duty of reasonable care to Plaintiffs and Class Members in deploying Google Analytics on its Appointment Making Services and by failing to supervise its employees, agents, contractors, and vendors in the acquisition, handling, and securing of the Plaintiffs' and Class Members' PHI.  CareNow further breached its duty of reasonable care to Plaintiffs and Class Members by sharing their PHI with Google, which actually and proximately caused injuries to Plaintiffs and the Class Members.

273.     CareNow also breached its duty of care by failing to provide reasonable and timely notice to Plaintiffs and the Class Members that their PHI had been shared with Google, which actually and proximately caused additional injuries to Plaintiffs and the Class Members.

274.     As a direct and traceable result of CareNow's negligence, Plaintiffs and Class Members have suffered damages, including monetary damages, increased risk of future harm, loss of privacy, and fear, anxiety, and worry about their loss of control over their PHI.

275.     CareNow's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiffs' and Class Members' actual, tangible, injury-in-fact and damages, including, without limitation, the improper disclosure of PHI, lost value of their PHI, and lost time and money incurred to mitigate this improper disclosure that resulted from and were caused by CareNow's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

276.     But for CareNow's wrongful and negligent breach of its duties owed to Plaintiffs and Class Members, Plaintiffs and Class Members would not have been injured. These injuries were the reasonably foreseeable result of Defendant's breach of its duties. CareNow knew or should have known that it was failing to meet its duties and that its breach would cause Plaintiffs and Class Members to suffer the foreseeable harm associated with the exposure of their PHI.

COPY

277. A data broker is a company that collects personal information from various sources, including online activities, and sells it to other businesses. These businesses then use this information for marketing, risk assessment, insurance pricing, and other purposes. Data brokers often operate effectively anonymously because they do not have direct contact with consumers. As a result, the vast majority of consumers are not even aware that their personal data is being sold and re-sold.

278. As a consequence of Defendant's negligence, Plaintiffs and Class Members have been harmed by losing control over their own PHI, which has now been shared with Google, with advertisers, and with online data brokers who buy, sell, and resell this information. The only way for Plaintiffs and Class Members to claw back the privacy of their PHI is to pay a data broker opt service to go out into the marketplace and remove their PHI from data broker rolls. Such data broker opt out services are offered by a variety of companies including DeleteMe, CyEx, and Optery for prices that range from $100 to $300 a year. Without hiring one of these data broker opt out services, however, Plaintiffs and Class Members have no way of recovering their privacy because CareNow itself has no control over their PHI once CareNow shared that data with Google.

279. Had Plaintiffs and Class Members known that CareNow would not adequately protect their PHI, Plaintiffs and Class Members would not have entrusted Defendant with their PHI.

280. Plaintiffs and Class members had a legitimate and reasonable expectation of privacy with respect to their PHI and were accordingly entitled to protection of this PHI against the acquisition and disclosure of their PHI by unreasonable means.

281. CareNow had notice and knew that its deployment of Google Analytics on its Appointment Making Services, where Plaintiffs and Class Members shared their PHI, would cause

73

COPY

injury to Plaintiffs and Class Members.  CareNow, like other healthcare providers, had notice from Google that it was improper to deploy Google Analytics on healthcare website but did so anyway because it valued profits more than patients' privacy. CareNow's conduct is reprehensible because it deployed Google Analytics technology knowing that this technology would share patient data with Google from inside its Appointment Making Services, but nevertheless did it anyway— regardless of the consequences for the thousands of patients who trusted CareNow to safeguard their most sensitive health information.

282.    As a proximate result of CareNow's acts and omissions, Plaintiffs' and Class Members' PHI was subject to intrusion, causing Plaintiffs and Class Members to suffer injury, including, at minimum, the following damages:

a.  General damages for invasion of their privacy rights in an amount to be determined by a jury without reference to specific pecuniary harm;

b.  Plaintiffs and Class Members cannot remediate the privacy harms they have suffered without spending hundreds of dollars a year to pay for third-party services to scrub their PHI from data broker rolls;

c.  Sensitive and confidential information including patient status and appointments that Plaintiffs and Class Members intended to remain private is no longer private;

d.  CareNow eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

e.  CareNow took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs and Class Members' knowledge, consent, or authorization and without sharing the benefit.

283.    The harm being suffered by Plaintiffs and Class Members is ongoing because—as

74

of the time of the filing of this complaint—CareNow continues to permit the deployment of Google Analytics on the Appointment Making Services it offers the public.

284. Plaintiffs and Class Members have no adequate remedy at law for the injuries that they have suffered (and will continue to suffer) because of CareNow's wrongful practices in that a judgment for money damages will not end the invasion of privacy for Plaintiffs and Class Members. Accordingly, Plaintiffs and Class Members seek such injunctive relief as the Court deems legal, equitable, and proper.

**COUNT II**
**Negligence *per se***
**(On Behalf of Plaintiffs and the Class)**

285. Plaintiffs reallege and incorporate the above allegations as if fully set forth herein.

286. Plaintiffs allege this negligence *per se* theory as alternative to their other negligence claims.

287. Pursuant to the laws set forth herein, HIPAA, the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C and the other sections identified above, Defendant was required by law to maintain adequate and reasonable data and cybersecurity measures to maintain the security and privacy of Plaintiffs' and Class Members' Private Information.

288. Plaintiffs and Class Members are within the class of persons that these statutes and rules were designed to protect.

289. Defendant had a duty to have procedures in place to detect and prevent the loss or unauthorized dissemination of Plaintiffs' and Class Members' PII and PHI.

75

COPY

290.    Defendant owed a duty to timely and adequately inform Plaintiffs and Class Members, in the event of their PII and PHI being improperly disclosed to unauthorized third parties.

291.    It was not only reasonably foreseeable, but it was intended, that the failure to reasonably protect and secure Plaintiffs' and Class Members' PII and PHI in compliance with applicable laws would result in an unauthorized third-party such as Google gaining access to Plaintiffs' and Class Members' PII and PHI, resulting in Defendant's liability under principles of negligence *per se*.

292.    Plaintiffs' and Class Member's PII and PHI constitute personal property that was taken and misused as a proximate result of Defendant's negligence, resulting in harm, injury and damages to Plaintiffs and Class Members.

293.    As a proximate result of Defendant's negligence and breach of duties as set forth above, Defendant's breaches of duty caused Plaintiffs and Class Members to, *inter alia*, have their data shared with third parties without their authorization or consent, receive unwanted advertisements that reveal seeking treatment for specific medical conditions, fear, anxiety and worry about the status of their PII and PHI, diminution in the value of their personal data for which there is a tangible value, and/or a loss of control over their PII and PHI, all of which can constitute actionable actual damages.

294.    In failing to secure Plaintiffs' and Class Members' PII and PHI, Defendant is guilty of oppression, fraud, or malice. Defendant acted or failed to act with a reckless, willful, or conscious disregard of Plaintiffs' and Class Members' rights. Plaintiffs, in addition to seeking actual damages, also seeks punitive damages on behalf of themselves and the Class.

295.    Defendant's conduct in violation of applicable laws directly and proximately

76

COPY

caused the unauthorized access and disclosure of Plaintiffs' and Class Members' PII and PHI, and as a result, Plaintiffs and Class Members have suffered and will continue to suffer damages as a result of Defendant's conduct. Plaintiffs and Class Members seek actual, compensatory, and punitive damages, and all other relief they may be entitled to as a proximate result of Defendant's negligence *per se*.

**COUNT III**
**Breach of Implied Contract**
*(On behalf of Plaintiffs and the Class)*

296.	Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

297.	Plaintiffs bring this claim on behalf of themselves and all Class Members.

298.	No express written contract exists between Plaintiffs and Class Members, on the one hand, and Defendant on the other.

299.	Under Tennessee law, an implied-in-fact contract comes into being when, notwithstanding the absence of a written agreement or verbal agreement expressing mutual obligations, the conduct or relations of the parties imply the existence of a contract.

300.	Defendant solicited and invited Plaintiffs and Class Members to provide their PHI via interactions with the Appointment Making Services as part of its regular business practices. Plaintiffs and Class Members accepted Defendant's offers and provided their PHI to Defendant as part of seeking medical services from their healthcare providers.

301.	The very nature of the Appointment Making Services that Defendant offered patients evinced an implied promise by Defendant that Plaintiffs' and Class Members' PHI would be protected from unauthorized disclosures—not shared with Google, Facebook, and numerous other Third Parties for the purposes of exploiting that PHI.

77

COPY

302. By encouraging Plaintiffs and Class Members to share their PHI within the Appointment Making Services, Defendant's conduct manifested an implied promise to maintain the confidentiality of Plaintiffs' and Class Members' PHI.

303. In furnishing Defendant with their PHI via Appointment Making Services, Plaintiffs and Class Members entered into an implied-in-fact contract with Defendant to retain and protect the privacy of their PHI from unauthorized disclosure to Third Parties such as Google.

304. Defendant required and obtained Plaintiffs' and Class Members' PHI as part of its relationship with Plaintiffs and Class Members as a healthcare provider and covered entity under HIPAA.

305. Implied in the exchange was a promise by Defendant to ensure that the PHI of Plaintiffs and Class Members in their possession would only be used for medical treatment purposes and would not be shared with Third Parties such as Google without the knowledge or consent of Plaintiffs and Class Members.

306. By asking for and obtaining Plaintiffs' and Class Members' PHI, Defendant assented to protecting the confidentiality of that information. Defendant's implicit agreement to safeguard the confidentiality of Plaintiffs' and Class Members' PHI was necessary to effectuate the contract between the parties.

307. Plaintiffs and Class members provided their PHI in reliance on Defendant's implied-in-fact promise that this information would not be shared with Third Parties without their consent.

308. In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendant would comply with applicable laws and regulations governing the disclosure of such information and that Defendant would not allow Google,

78

Facebook, and other Third Parties to collect and exploit their communications with Defendant without their consent.

309. It is clear by these exchanges that the parties intended to enter into an agreement and mutual assent occurred. Plaintiffs and Class Members would not have disclosed their PHI to Defendant but for the prospect of Defendant's implied promise to protect the confidentiality of their PHI.

310. Conversely, Defendant presumably would not have taken Plaintiffs and Class Members' PHI (much less offered the Appointment Making Services) if they did not intend to provide them with this benefit.

311. Defendant was therefore required to reasonably safeguard and protect the PHI of Plaintiffs and Class Members from unauthorized disclosure and/or use by Google, Facebook, and other Third Parties.

312. Plaintiffs and Class Members accepted Defendant's medical services offer and fully performed their obligations under the implied contract with Defendant by providing their PHI to Defendant.

313. Plaintiffs and Class Members would not have provided and entrusted their PHI to Defendant in the absence of their implied contracts with Defendant and would have instead retained the opportunity to control their PHI for uses other than the benefits offered by Defendant.

314. Plaintiffs and Class Members relied on Defendant's implied-in-fact promise to safeguard their PHI to their detriment.

315. Defendant breached the implied contracts with Plaintiffs and Class Members by failing to reasonably safeguard and protect Plaintiffs' and Class Members' PHI from disclosure to Google and other Third Parties.

79

316. Defendant's failure to implement adequate measures to protect the PHI of Plaintiffs and Class Members and Defendant's intentional disclosure of the same to Google, Facebook, and other Third Parties violated the purpose of the agreement between the parties: Plaintiffs' and Class Members' provision of PHI in exchange for medical services and other benefits.

317. Instead of safeguarding Plaintiffs' and Class Members' PHI, Defendant intentionally shared that information with Google, Facebook, and other Third Parties, thereby breaching the implied contracts it had with Plaintiffs and Class Members.

318. Plaintiffs and Class Members reasonably believed and expected that Defendant would operate the Appointment Making Services free of surreptitious collection and exploitation of patients' PHI. Defendant failed to do so.

319. Plaintiffs and Class Members would not have used the Appointment Making Services if they knew that Defendant would share their PHI with Google, Facebook, and other Third Parties without their knowledge or written consent.

320. Both the provision of medical services, including access to medical records, and the protection of Plaintiffs' and Class Members' PHI were material aspects of these implied-in-fact contracts.

321. A meeting of the minds occurred when Plaintiffs and the Class Members agreed to, and did, provide their PHI to Defendant and/or their affiliated healthcare providers via the Appointment Making Services.

322. Plaintiffs and the Class Members performed their obligations under the contract when they paid for their healthcare services and provided their PHI.

323. Plaintiffs and Class Members reasonably assumed that the monies being paid on their behalf to CareNow, in part, to protect their PHI against unauthorized disclosure to Google,

80

Facebook, and other Third Parties.

324. Defendant materially breached its contractual obligation to protect the nonpublic PHI that Defendant gathered when they allowed Google and other Third Parties to collect and exploit that information from the Appointment Making Services without Plaintiffs' and Class Members' consent.

325. Defendant also materially breached its implied-in-fact contractual obligation to protect Plaintiffs' and Class Members' non-public PHI when they failed to implement adequate security measures and policies to protect the confidentiality of that information. For example, on information and belief, Defendant (1) failed to implement internal policies and procedures prohibiting the disclosure of patients' PHI without consent to Third Party advertising companies like Google and Facebook, (2) failed to implement adequate reviews of the software code and JavaScript installed on its websites to ensure that patients' PHI was not being automatically routed without consent to Third Party advertising companies like Google and Facebook, (3) failed to provide adequate notice to the public that visitors to its websites risked having their PHI shared with Third Party advertising companies like Google and Facebook, (4) failed to take other industry standard privacy protection measures such as providing a "cookie" acceptance button on its website homepages, (5) failed to provide visitors to its websites with a means to opt out of the automatic transfer of data regarding their website interactions to Third Party advertising companies like Google and Facebook, (6) failed to implement internal policies and educational programs to ensure that Defendant's website managers and coders were familiar with the legal regulations governing the disclosure patient PHI to Third Parties, and (7) failed to install adequate firewalls or take similar measures to prevent the automatic routing of patients' PHI to Third Party advertising companies like Google and Facebook.

81

COPY

326. As a result of Defendant's failure to fulfill the data privacy obligations it impliedly agreed to, Plaintiffs and Class members did not receive the full benefit of their bargains and instead received healthcare and other services that were of a diminished value compared to what they were entitled to.

327. The medical services that Defendant offers are available from other companies that do protect the confidentiality of patient communications.

328. Had Defendant disclosed that it would allow Google and other Third Parties to secretly collect Plaintiffs' and Class Members' PHI from the Appointment Making Services, neither the Plaintiffs, the Class Members, nor any reasonable person would have used the Appointment Making Services provided by Defendant.

329. Defendant's conduct in sharing Plaintiffs' and Class Members' PHI with Google and other Third Parties diminished the sales value of that information. There is a robust market for the type of information that Plaintiffs and Class Members shared with Defendant (which Defendant then shared with Google and other Third Parties). Indeed, Google itself has offered to pay the public to acquire similar information in the past so that Google could use such information for marketing purposes. Plaintiffs and Class Members were harmed both by the dissemination of their PHI and by losing the sales value of that information.

330. As a direct and proximate result of these failures, Plaintiffs and the Class Members have been harmed and have suffered, and will continue to suffer, actual damages and injuries, including, without limitation, the release and disclosure of their PHI, the loss of control of their PHI, and the loss of the benefit of the bargain they had struck with Defendant.

331. Plaintiffs and the Class members are entitled to compensatory and consequential damages suffered as a result.

332.    Plaintiffs and Class Members would not have entrusted Defendant with their Private Information in the absence of an implied contract between them and Defendant obligating Defendant to not disclose Private Information without consent.

333.    Defendant breached these implied contracts by disclosing Plaintiffs' and Class Members' Private Information to Unauthorized Parties. As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiffs and Class Members sustained damages as alleged herein, including but not limited to the loss of the benefit of their bargain and diminution in value of Private Information.

334.    Plaintiffs and Class Members are entitled to compensatory and consequential damages as a result of Defendant's breach of implied contract.

**COUNT IV**
**Unjust Enrichment**
*(On behalf of Plaintiffs and the Class)*

335.    Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

336.    Plaintiffs bring this claim on behalf of themselves and all Class Members.

337.    Plaintiffs bring this claim in the alternative to their claim for breach of implied contract.

338.    Tennessee law recognizes a cause of action for unjust enrichment.

339.    Plaintiffs and Class Members conferred a benefit on Defendant in the form of valuable sensitive medical information that Defendant collected from Plaintiffs and Class Members under the guise of keeping this information private, and Defendant appreciated this benefit.

340.    Defendant gained access to the PHI provided by Plaintiffs and Class Members by (1) knowingly concealing its use of Tracking Technologies from the public; (2) failing to provide

83

COPY

industry standard privacy safeguards for its patients' PHI; (3) intentionally disregarding years of warnings from Google, HHS, and other public and private entities that it was obligated to protect its patients' PHI from unauthorized disclosures to Third Parties; and (4) intentionally violating California law.

341.    Defendant benefited from the use of Plaintiffs' and Class Members' private communications and PHI and unjustly retained those benefits at their expense.

342.    Defendant collected, used, and disclosed this information for its own gain, including for advertisement purposes, sale, or trade for valuable services from Third Parties. Specifically, Defendant bartered Plaintiffs' and Class Members' PHI to Google, Facebook, and other Third Parties in return for both advertising benefits and "free" website analytics information. What is more, by sharing patients' PHI with Google, Defendant gained the ability to utilize Google's customized audiences and targeted advertising features, which saved CareNow substantial revenues by making advertising far less expensive than it would have been otherwise. CareNow also gained access to free website analytics data from Third Parties, which it otherwise would have had to spend substantial amounts of money to provide for itself.

343.    Plaintiffs and Class Members would not have used Defendant's services if they had known that Defendant would collect, use, and disclose this information to Third Parties like Google.

344.    Defendant exceeded any authorization given and instead consciously disclosed and used this information for its own gain, providing Defendant with economic, intangible, and other benefits, including substantial monetary compensation.

345.    The Third Parties are not charities.  Third Parties were willing to provide Defendant with "free" analytics benefits only because the PHI that Defendant surreptitiously shared with

84

those Third Parties has an economic value many times in excess of the analytics services that the Third Parties provided Defendant.

346.    Defendant's decision to intentionally mislead Plaintiffs and Class Members about its use of Tracking Technologies for its own financial benefit is a textbook example of an "unjust" enrichment.

347.    Defendant unjustly retained those benefits at the expense of Plaintiffs and Class Members because Defendant's conduct damaged Plaintiffs and Class Members, all without providing any commensurate compensation to Plaintiffs and Class Members.

348.    Plaintiffs were aware of the economic value of their PHI and reasonably expected to be compensated by any party who shared or accessed their PHI to sell advertising.  Plaintiffs and Class Members did not consent to Defendant giving their PHI away for free.

349.    By engaging in the acts and failures to act described in this Complaint, Defendant has been knowingly enriched by the savings in costs that should have been reasonably expended to protect the PHI of the Plaintiffs and the Class.

350.    Defendant was on notice that patients' PHI was protected by law; that patients' PHI had substantial monetary value; that cyber criminals and advertising companies were highly desirous of obtaining access to its patients' PHI, yet failed to take reasonable steps to pay for the level of data security and privacy training that would have presented the unauthorized disclosure of patients' PHI to Google, Facebook, and other Third Parties.

351.    The benefits that Defendant derived from Plaintiffs and Class Members rightly belong to Plaintiffs and Class Members.  It would be inequitable under unjust enrichment principles for Defendant to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

85

COPY

352. Defendant should be compelled to disgorge in a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

353. Defendant benefits from the use of Plaintiffs' and Class Members' Private Information and unjustly retained those benefits at their expense.

354. Plaintiffs and Class Members conferred a benefit upon Defendant in the form of Private Information that Defendant collected from Plaintiffs and Class Members, without authorization and proper compensation. Defendant consciously collected and used this information for its own gain, providing Defendant with economic, intangible, and other benefits, including substantial monetary compensation.

355. Defendant unjustly retained those benefits at the expense of Plaintiffs and Class Members because Defendant's conduct damaged Plaintiffs and Class Members, all without providing any commensurate compensation to Plaintiffs and Class Members.

356. The benefits that Defendant derived from Plaintiffs and Class Members was not offered by Plaintiffs and Class Members gratuitously and rightly belongs to Plaintiffs and Class Members. It would be inequitable under unjust enrichment principles in Tennessee and every other state for Defendant to be permitted to retain any of the profit or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

357. Under Tennessee law, Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

**COUNT V**
**Invasion of Privacy—Intrusion upon Seclusion**
(*On behalf of Plaintiffs and the Class*)

358. Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

359. Plaintiffs and Class Members had a reasonable expectation of privacy in their communications with Defendant via its Website and Online Platforms and the communications platforms and services therein.

360. Plaintiffs and Class Members communicated sensitive PHI and PII, including their appointment information, that they intended for only Defendant to receive and that they understood Defendant would keep private.

361. Defendant's disclosure of the substance and nature of those communications to third parties without the knowledge and consent of Plaintiffs and Class Members is an intentional intrusion on Plaintiffs' and Class Members' solitude or seclusion and their private affairs and concerns.

362. Plaintiffs and Class Members had a reasonable expectation of privacy that their communications regarding healthcare with their healthcare providers will be kept confidential. Defendant's disclosure of PHI coupled with PII is highly offensive to the reasonable person.

363. As a result of Defendant's actions, Plaintiffs and Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

364. Plaintiffs and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

365. Plaintiffs and Class Members seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate Plaintiffs and Class Members for the harm

87

COPY

to their privacy interests as a result of its intrusions upon Plaintiffs' and Class Members' privacy.

366. Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

367. Plaintiffs also seeks such other relief as the Court may deem just and proper.

## COUNT VI
### Breach of Fiduciary Duty
(*On Behalf of Plaintiffs and the Class*)

368. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

369. Plaintiffs bring this claim on behalf of themselves and all Tennessee Class Members.

370. A relationship existed between Plaintiffs and the Class, on the one hand, and Defendant, on the other, in which Plaintiffs and the Class put their trust in Defendant to protect the PHI of Plaintiffs and the Class, and Defendant accepted that trust.

371. Defendant breached the fiduciary duty that it owed to Plaintiffs and the Class Members by failing to act with the utmost good faith, fairness, and honesty, failing to act with the highest and finest loyalty, and failing to protect, and intentionally disclosing, their PHI.

372. Defendant's breach of fiduciary duty was a legal cause of injury-in-fact and damage to Plaintiffs and the Class, as alleged herein.

373. But for Defendant's breach of fiduciary duty, the injury-in-fact and damage to Plaintiffs and the Class would not have occurred.

374. Defendant's breach of fiduciary duty substantially contributed to Plaintiffs' and Class Members' damages.

88

COPY

375.     As a direct and proximate result of Defendant's breach of fiduciary duty, Plaintiffs and Class Members are entitled to and do demand actual, compensatory, nominal and punitive damages, injunctive relief, and all other relief allowed by law.

## COUNT VII
### Violation of Tenn. Code Ann. §§ 39-13-601
#### (*On Behalf of Plaintiffs and the Class*)

376.     Plaintiffs re-allege and incorporate the preceding paragraphs.

377.     Plaintiffs bring this claim on behalf of themselves and the Tennessee Class Members.

378.     Tenn. Code Ann. § 39-13-601 provides that a person commits an offense who:

> (A) Intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication;
>
> . . .
>
> (C) Intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection (a); or
>
> (D) Intentionally uses, or endeavors to use, the contents of any wire, oral or electronic communication, knowing or having reason to know, that the information was obtained through the interception of a wire, oral or electronic communication in violation of this subsection (a).

Tenn. Code Ann. § 39-13-601(a)(1).

379.     For purposes of Tenn. Code Ann. § 39-13-601 "intercept" is "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device[.]" Tenn. Code Ann. § 40-6-303(11).

380.     Defendant intentionally acquired and intercepted Plaintiffs' and Class Members' electronic communications without the consent of the Plaintiffs and Class Members, using the

COPY

Meta Pixel and other trackers, in violation of Tenn. Code Ann. § 39-13-601.

381. Defendant intentionally acquired and intercepted Plaintiffs' and Class Members' electronic communications for the purpose of disclosing those communications to third parties, including Facebook, without the knowledge, consent, or written authorization of Plaintiffs or Class Members, for the purpose of committing tortious acts as complained of in the preceding paragraphs, in violation of Tenn. Code Ann. § 39-13-601.

382. Defendant aided in the acquisition and interception of communications between Plaintiffs and Class Members and Defendant that were redirected and disclosed to and recorded by third parties, including Google, without the Plaintiffs' or Class Members' consent.

383. The devices used in the case include, but are not limited to:

    a. Those to which Plaintiffs' and Class Members' communications were disclosed;

    b. Plaintiffs' and Class Members' computing devices;

    c. Plaintiffs' and Class Members' web browsers;

    d. The Google Analytics pixel;

    e. Internet cookies;

    f. Defendant's computer servers;

    g. Third-party source code utilized by Defendant; and

    h. Third-party computer servers (including Google).

384. The "contents" of Plaintiffs' and Class Members' electronic communications included at least:

    a. the parties to the communications;

    b. the precise text of their search queries;

    c. personally identifiable information such as their IP addresses, Google IDs,

90

COPY

browser fingerprints, and other unique identifiers;

    d.   the precise text of their communications about specific doctors;

    e.   the precise text of their communications about specific medical conditions;

    f.   the precise text of their communications about specific treatments;

    g.   the precise text of their communications about scheduling appointments with medical providers;

    h.   the precise text of their communications about billing and payment;

    i.   information that is a general summary or informs third parties of the general subject of communications that Experity and CareNow sent back to them in response to requests for information about specific doctors, conditions, treatments, and other information; and

    j.   any other content that Experity has aided third parties in scraping from webpages or communication forms in the Appointment Making Services.

385.    Plaintiffs' and Class Members' communications using the Appointment Making Services constitute "electronic communications" because they were wholly or partially transmitted by wire, electromagnetic, and/or photoelectronic systems including, but not limited to:

    a.   Plaintiffs' and Class Members' personal computing devices;

    b.   Plaintiffs' and Class Members' web browsers;

    c.   Plaintiffs' and Class Members' browser-managed files;

    d.   Plaintiffs' and Class Members' mobile phone browsers;

    e.   Google Analytics;

    f.   Internet cookies;

    g.   HCA's computer servers;

91

COPY

h.  CareNow's computer servers;

i.  Third-party source code used by Defendant; and

j.  Third-party source code used by Experity and permitted by Defendant.

386.  CareNow violated the Tenn. Code Ann. § 39-13-601 by intercepting and subsequently disclosing Plaintiffs' and Class Members' electronic communications via the deployment of Tracking Technologies, including Google Analytics on the Appointment Making Services webpages.

387.  Whenever Plaintiffs and Class Members interacted with the Appointment Making Experity and Defendant, through the Tracking Technologies they embedded and ran on the Appointment Making Services, intentionally intercepted and divulged the contents of Plaintiffs' and Class Members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, *i.e.*, Google and other Third Parties.

388.  Without Plaintiffs' and Class Members' knowledge or consent, Experity and Defendant acquired the content of Plaintiffs' and Class Members' communications while they were still exchanging communications with their healthcare providers inside the Appointment Making Services. Experity and Defendant then caused these same communications to be disclosed to Google and other Third Parties in return for marketing and advertising benefits.

389.  In violation of 42 U.S.C. § 1320d-6, Defendant knowingly disclosed "individually identifiable health information to another person"—*i.e.*, Google, New Relic, and other Third Parties.  As set forth more fully throughout this Complaint, Defendant's disclosures of patients' Protected Health Information were "knowing" because, among other things:

a.  Defendant deliberately chose to deploy Tracking Technologies on the

92

COPY

Appointment Making Services knowing they contained PHI.

b. Defendant knew that by deploying Tracking Technologies on the Appointment Making Services they were permitting Third Parties to collect, use, and share Plaintiffs' and the Class Members' PHI, including sensitive medical information and personally identifiable data.

c. Google warns web developers that Google Analytics is not appropriate for health-related webpages and websites. Indeed, Google warns web developers that "Health" is a prohibited category that should be used by advertisers to target ads to users or promote advertisers' products or services. Defendant either knew or should have known of these warnings from Google, and despite the warnings deployed Google Analytics in its Appointment Making Services.

d. HHS and other government authorities have also warned that Tracking Technologies are not appropriate for health-related webpages and websites and expressly warned that they can disclose PHI in violation of HIPAA and other applicable laws. Defendant either knew or should have known of these warnings, and despite the warnings, deployed Tracking Technologies in the Appointment Making Services.

e. Defendant intentionally concealed its use of Tracking Technologies from the public, suggesting Defendant knew what it was doing was illegal.

f. Defendant accessed, obtained, and disclosed Plaintiffs' and Class Members' PHI for the purpose of committing the crimes and torts described in detail in this complaint.

390. Defendant further violated 42 U.S.C. § 1320d-6 by intentionally disclosing

93

Plaintiffs' and Class Members' PHI to Third Parties for the purpose of obtaining "commercial advantage" over its rivals in the marketplace. Specifically, Defendant shared Plaintiffs' and Class Members' PHI with Google and other Third Parties in return for free advertising and marketing tools, along with aggregated patient data, that Defendant used to optimize the Appointment Making Services and its marketing campaigns, so that Defendant could increase profitability and the ROI on marketing and advertising spend. By exploiting Plaintiffs' and Class Members' PHI in this manner, Defendant hoped to take market share away from its business rivals in the online healthcare services market.

391. Google and other Third Parties, in turn, used the PHI they received from Defendant and its clients to sell targeted advertising to other third parties. While that bargain may have enriched Google, Facebook, and Defendant, it came at the expense of Plaintiffs and Class Members.

392. For example, when a patient makes contact with the Appointment Making Services to exchange communications with his or her health care provider, a "TLS handshake" occurs that opens a line between the patient's communications device and Experity's servers. The line remains open and communications continue to flow back and forth from the patient's communications device and the servers. The patient's communications with his or her healthcare provider flow through this open line. At the same time that the line is open and communications remain "in transit" between the patient's communications device and Experity's server, CareNow, through its vendor Experity, also placed the content of the communication in temporary electronic storage and long-term storage, rendering a communication in transit, electronic storage, and storage all at the same time.

393. Google and the other Third Parties were parties to Plaintiffs' and Class Members'

94

communications with their healthcare providers.

394. Nor does the party exception in the Wiretap Statute apply to Defendant. The party exception in the statute does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State. Therefore, Defendant is liable under the statute because it acted with the purpose of committing criminal and tortious acts in violation of federal and state laws, including but not limited to:

  a. A criminal violation of 42 U.S.C. § 1320d-6 regardless of any subsequent purpose or use of the individually identifiable health data; and

  b. A violation of HIPAA, particularly 42 U.S.C. § 1320d-6, which is a criminal offense punishable by fine or imprisonment with increased penalties where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage [or] personal gain."

  c. A knowing breach of Defendant's common law and fiduciary duties to Plaintiffs and Class Members.

395. Defendant accessed and obtained Plaintiffs' and Class Members' PHI for the purpose of committing the crimes and torts described herein. More specifically, Defendant intercepted Plaintiffs' and Class Members' communications so that Defendant could share those communications with Google and other Third Parties in return for advertising and marketing benefits. This intended and intentional disclosure violated both federal and state laws as set out above.

396. Defendant would not have been able to obtain these advertising or marketing services if they had complied with those laws. Moreover, Defendant knew that its conduct was

95

COPY

illegal under those laws.

397. On information and belief, Defendant's own internal (*i.e.*, non-public) policies expressly recognized and acknowledged that it violates HIPAA to disclose patient health information to third parties in conjunction with identifiers such as IP addresses, URLs, medical record numbers, and other identifiers. Despite these internal policies, Defendant nevertheless shared such information with Google via Tracking Technologies for the purpose of surreptitiously violating HIPAA and other applicable laws without patients' knowledge or consent.

398. Although Plaintiffs and Class Members consented to Defendant acquiring their PHI for purposes of facilitating their medical care, Plaintiffs and Class Members did not consent to Defendant acquiring their PHI for purposes of re-directing it to Google and other Third Parties so that those companies could exploit their PHI for marketing and advertising purposes.

399. As such, Defendant cannot claim any exception to liability.

400. As a direct and proximate result of Defendant's violation of the Tenn. Code Ann. § 39-13-601, Plaintiffs and Class Members were damaged by Defendant's conduct in, at minimum, the following ways:

    a. Defendant harmed Plaintiffs' and Class Members' interest in privacy;

    b. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is private no longer;

    c. Plaintiffs and Class Members cannot remediate the privacy harms they have suffered without spending hundreds of dollars a year to pay for third-party services to scrub their PHI from data broker rolls;

    d. Defendant eroded the essential confidential nature of the provider-patient relationship;

COPY

e.  Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' authorization, informed consent, or knowledge, and without sharing the benefit;

f.  Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included their healthcare providers' duty to maintain confidentiality; and

g.  Defendant's actions diminished the value of Plaintiffs and Class Members' PHI.

401.  In violating the Tenn. Code Ann. § 39-13-601, Defendant's conduct was a knowing, conscious, and deliberate wrongdoing, and carried out with an evil or wrongful motive, an intent to injure Plaintiffs, and a recklessly negligent or callous indifference to Plaintiffs' and Class Members' protected rights under both state and federal law.

402.  For example, Defendant was specifically warned by Google that placing Google Analytics on a health-related website such as the appointment making websites that they offered would result in PHI being shared with Google in violation of HIPAA.

403.  Defendant was also warned by HHS that placing tracking technologies on a health-related website like the appointment making websites offered by Defendant would result in HIPAA violations.

404.  Despite being fully aware that deploying Google Analytics on the Appointment Making Services would result in criminal HIPAA violations, Defendant nevertheless routinely deployed Google Analytics on its websites.

405.  Worse, not only was Defendant aware that deploying such Tracking Technologies was illegal under HIPAA, Defendant also knew at the time it deployed the technologies that

embedding Google Analytics on websites would result in vast quantities' of patients' health data being shared with Google because that is what those technologies are specifically designed to do.

406.    Indeed, Defendant not only intentionally harmed Plaintiffs and Class Members without just cause but also acted with a deliberate and flagrant disregard for their safety and privacy.  Specifically:

a.   Defendant knew it had a duty to safeguard and keep confidential Plaintiffs' and Class Members' PHI under HIPAA and other applicable laws;

b.   Defendant knew that Plaintiffs and Class Members reasonably expected their communications with healthcare providers to remain private;

c.   Defendant knew that Plaintiffs' and Class Members' communications involved private and sensitive matters concerning Plaintiffs' and Class Members' healthcare;

d.   Defendant knew it was prohibited by law from intercepting and disclosing Plaintiffs' and Class Members' communications;

e.   Defendant knew that Google, Facebook, and other Third Parties used the Sensitive Health Information that they were receiving for marketing purposes;

f.   Defendant knew that it was required to sign a business associate agreement with any Tracking Technology vendor with whom Defendant was sharing patients' PHI;

g.   Defendant knew that its use of the Tracking Technologies at issue violated its duties under HIPAA and other applicable laws, among other things as set forth in the December 2022 HHS Bulletin;

h.   Defendant nonetheless knowingly and deliberately intercepted and disclosed to

COPY

Third Party advertisers Plaintiffs' and Class Members' PHI without Plaintiffs' or Class Members' consent, in a knowing violation of HIPAA, the Tenn. Code Ann. § 39-13-601, and other laws;

i. Worse, Defendant intentionally concealed the fact that there was Google Analytics tracking technology on the website from the public;

j. Defendant also intentionally concealed from the public the fact that, every time patients made an appointment, their appointment data was shared with Google for marketing purposes;

k. Defendant carried out its unlawful conduct with the wrongful and evil motive to appropriate Plaintiffs' and Class Members' private PHI at Plaintiffs' and Class Members' expense and for its own financial gain; and

l. Defendant's conduct was particularly egregious and reprehensible because they acquired Plaintiffs' and Class Members' PHI under the guise of offering healthcare services to Plaintiffs and Class Members.

407. While not an element of Plaintiffs' and Class Members' wiretap claim, based on the facts specifically identified the above paragraph, as well as the factual allegations contained elsewhere in this Complaint, a jury could reasonably conclude that Defendant intentionally and purposefully set out to violate HIPAA when they decided to deploy surreptitious tracking technologies on the Appointment Making Services.

408. Under Tenn. Code § 39-13-603, "any aggrieved person whose wire, oral or electronic communication is intentionally intercepted, disclosed, or used in violation of § 39-13-601 […] may in a civil action recover from the person or entity that engaged in that violation the following relief:

99

(1) The greater of:

    (A) The sum of the actual damages, including any damage to personal or business reputation or relationships, suffered by the plaintiff and any profits made by the violator as a result of the violation; or

    (B) Statutory damages of one hundred dollars ($100) a day for each day of violation or ten thousand dollars ($10,000), whichever is greater;

(2) Punitive damages; and

(3) A reasonable attorney's fee and other litigation costs reasonably incurred.

Tenn. Code Ann. § 39-13-603(a).

409. In addition to statutory damages, Defendant's violations of Tenn. Code Ann. § 39-13-601, caused Plaintiffs and Class Members the following damages:

a. Plaintiffs and Class Members cannot remediate the privacy harms they have suffered without spending hundreds of dollars a year to pay for third-party services to scrub their PHI from data broker rolls;

b. Sensitive and confidential information including patient status and appointments that Plaintiffs and Class Members intended to remain private is no longer private;

c. CareNow eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

d. CareNow took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs and Class Members' knowledge, consent, or authorization and without sharing the benefit.

410. Plaintiffs and Class Members seek actual damages or statutory damages, whichever is greater, arising from Defendant's violations of Tenn. Code Ann. § 39-13-601, punitive damages, as well as reasonable attorneys' fees and costs.

100

EFILED  06/11/26 02:11 PM  CASE NO. 26C1744  Joseph P. Day, Clerk

411.    Plaintiffs and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

## DEMAND FOR JURY TRIAL

412.    Plaintiffs hereby demand a trial by jury on all issues so triable.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other Class Members, respectfully request relief against Defendant as set forth below:

a.    Certifying the Class and appointing Plaintiffs as the Classes' representative;

b.    Finding that Defendant's conduct as alleged herein was unlawful;

c.    Awarding such injunctive and other equitable relief as the Court deems just and proper, including, but not limited to, enjoining Defendant from making any further disclosure of Plaintiffs and Class Members' communications to Third Parties without the Plaintiffs and Class Members' express, informed, and written consent; requiring Defendant to implement adequate procedures for ensuring the confidentiality of patients' PHI; mandating that Defendant hire third-party monitors for a period of at least three years to ensure that the these steps have been taken; and mandating that Defendant provide written verifications on a quarterly basis to the court and counsel for Plaintiffs and Class Members in the form of a declaration under oath that the above steps;

d.    Awarding statutory damages for Defendant's violation of the Tennessee wiretap statute;

e.    Imposing a constructive trust against Defendant through which Plaintiffs and Class Members can be compensated for any unjust enrichment gained by Defendant;

f.    Awarding Plaintiffs and Class Members statutory, actual, compensatory, consequential, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

g.    Awarding Plaintiffs and Class Members pre-judgment and post-judgment interest as provided by law;

h.    Awarding Plaintiffs and Class Members reasonable attorneys' fees, costs, and expenses;

i.    Awarding costs of suit; and

101

COPY

j.      Such other and further relief to which Plaintiffs and Class Members may be entitled.

Dated: June 11, 2026                              Respectfully submitted,

*/s/ J. Gerard Stranch, IV*
J. Gerard Stranch, IV (BPR # 023045)
Grayson Wells (BPR # 039658)
**STRANCH, JENNINGS, & GARVEY, PLLC**
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Tel: (615) 254-8801
gstranch@stranchlaw.com
gwells@stranchlaw.com

Lynn A. Toops*
**COHEN & MALAD, LLP**
One Indiana Square, #1400
Indianapolis, IN 46204
Tel: (317) 636-6481
ltoops@cohenandmalad.com

Foster C. Johnson*
Mark Holden*
**AHMAD, ZAVITSANOS, & MENSING, PLLC**
1221 McKinney Street, Suite 3460
Houston, TX 77010
Tel: (713) 655-1101
fjohnson@azalaw.com

Matthew J. Langley*
matt@almeidalawgroup.com
**ALMEDIA LAW GROUP, LLC**
849 W. Webster Avenue
Chicago, Illinois 60614
Tel: (713) 554-9354
matt@almeidalawgroup.com

***Counsel for Plaintiffs and the proposed Class***

*** Pro Hac Vice Forthcoming**

102